FRED DRAPER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63818, 63819, 63826. Filed May 29, 1959.

---

[1] Proceedings of the following petitioners are consolidated herewith: Fred Draper and Carrie Draper, Docket No. 63819; Carrie Draper, Docket No. 63826.

*Paul Castoldi, Esq., Francis J. Butler, Esq.,* and *John T. Raftis, Esq.,* for the petitioners.

*T. M. Mather, Esq.,* and *James D. Webb III, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income taxes and additions to the tax for the years and in the amounts as follows:

| Year | Deficiency | Additions to tax [2] | |
|---|---|---|---|
| | | Sec. 293(b) | Sec. 294(d) |
| Fred Draper, Docket No. 63818 | | | |
| 1944 | $6,454.90 | $3,227.45 | $509.62 |
| 1945 | 3,166.60 | 1,583.30 | 117.88 |
| 1946 | 1,970.64 | 3,469.10 | 480.77 |
| 1947 | 17,324.59 | 8,662.30 | |
| Fred Draper and Carrie Draper, Docket No. 63819 | | | |
| 1948 | $79,332.85 | $39,666.43 | $10,440.60 |
| 1949 | 3,442.04 | | |
| Carrie Draper, Docket No. 63826 | | | |
| 1944 | $6,528.24 | $3,264.12 | $526.68 |
| 1945 | 3,185.46 | 1,592.73 | 122.53 |
| 1946 | 1,981.76 | 3,496.38 | 494.57 |
| 1947 | 17,334.79 | 8,667.40 | |

The issues are:

(1) Whether the loss occasioned by the destruction in 1949 of a storage building owned by the petitioners was subject to the provisions contained in section 117 (j) ;

(2) Whether amounts which petitioners contributed to the Draper Trust in the years 1948 and 1949 are deductible as charitable contributions under the provisions of section 23 (o) ;

(3) Whether an amount in excess of 25 per cent of the gross income reported by petitioners for 1944 was omitted from gross income so that the taxable year 1944 is open as to each petitioner under the

---

[2] All section references are to the Internal Revenue Code of 1939

special exceptions to the statute of limitations contained in section 275 (c);

(4) Whether the amount of $120,591.21, transmitted by the petitioners to the collector of internal revenue under date of June 13, 1951, in anticipation of a possible tax deficiency which has never been assessed and which was placed by the collector in a suspense account, was a payment of tax which would start the running of the statute of limitations upon refunds; and

(5) Whether petitioner Fred Draper filed false and fraudulent income tax returns for the taxable years 1944 to 1947, inclusive, and a false and fraudulent joint income tax return for the taxable year 1948 with his spouse, petitioner Carrie Draper.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners are husband and wife who, during the taxable years 1944 to 1949, inclusive, resided in or near the city of Colville, Washington. Their returns for the years involved were filed with the collector of internal revenue for the district of Washington. Although both Fred and Carrie Draper were legally married during the years 1944 to 1949, inclusive, they did not occupy the same residence.

Aside from the general facts found above, our findings of fact and opinion on each of the several issues are presented separately below.

### *Issue 1.*

### FINDINGS OF FACT.

In April 1949, petitioners began construction of a briquette storage building for use in the lumber business. Petitioners had expended $475.67 with respect to the building by the end of April, and $4,103.42 by May 31, 1949. The building was completed at a cost of $14,013.99 in August 1949. On November 27, 1949, the building was destroyed in large part by a windstorm resulting in a loss of $11,613.99. During the same year, petitioners realized a long-term capital gain from the sale of property used in petitioners' trade or business in the amount of $1,400. Petitioners treated the loss of $11,613.99 due to the destruction of the building and the gain from the sale of the property used in the trade or business separately on their tax return filed for the year 1949, deducting the $11,613.99 loss in full and including in income only $700 of the $1,400 gain. Respondent deducted the $1,400 gain from the amount of the casualty loss and treated the difference as an ordinary loss.

At least $1,400 of the loss on the briquette building represented the cost of an asset used in petitioners' trade or business, held for more than 6 months.

OPINION.

On their return petitioners deducted the full casualty loss of $11,-613.99 and included as a separate item of income $700 representing one-half of the $1,400 gain on section 117(j) property. Where there are in the same taxable year both losses and gains which qualify under section 117(j), the statute requires that they be offset against each other in full, with only the net gain to be treated as a long-term capital gain or, alternatively, with only the net loss to be treated as an ordinary loss.[3]

The respondent does not question the fact that petitioners suffered a casualty loss in the amount of $11,613.99. However, if as much as $1,400 of that loss was a 117(j) loss then it must be reduced by the full $1,400 gain on 117(j) property, and the petitioners would have a deduction of only $10,213.99, as determined by the respondent, rather than the full $11,613.99 claimed. The difference in result under the theory advanced by the petitioners and that of the respondent is $700 in income.

The petitioners maintain that the briquette storage building had not been used or held for more than 6 months and, therefore, does not qualify as a 117(j) asset and need not be offset by the $1,400 gain. The respondent contends that $4,000 had been expended prior to May 31, 1949, and that to that extent the part of the building rep-

---

[3] SEC. 117.  CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph:

(A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply.

(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

resented by the $4,000 expenditure qualifies for treatment as a 117(j) asset.

In *M. A. Paul*, 18 T.C. 601 (1952), revd. 206 F. 2d 763 (C.A. 3, 1953), we considered the question of whether an apartment building qualified as a 117(j) asset when the completed building had not been held for 6 months. In that case, construction had commenced prior to a date 6 months before the sale of the building. We held that the holding period referred to in section 117(j) begins on the date the asset is acquired or, in the case of construction, on the date construction is completed. The Court of Appeals took a contrary view and required an allocation, declaring in part:

> The Commissioner objects to an allocation, arguing that the asset that was sold and upon which the gain was realized was the whole building and not a part of it. That is true, but it is obvious that part of what was sold was held for more than six months. Thus, that part satisfies all the requirements of Section 117(j). Allocation here is practical and fair. We see no reason to make this an all-or-nothing proposition. It is certainly realistic to recognize that there are gradations between no building and a completed building, and we think it proper that those gradations have tax significance. * * *

It is true that the *Paul* case involved a gain while here we are concerned with a loss. It is also true that that case concerned a sale or exchange while here we are concerned with the destruction of property. However, the central point of difference between our decision in *Paul* and that of the Court of Appeals lay in a determination of whether an asset had been held for 6 months. The same question is the critical point at issue here. Upon careful reconsideration, we are of the opinion that on the question of the holding period the reasoning of the Court of Appeals in *Paul* v. *Commissioner*, 206 F. 2d 763, is correct. See also *Commissioner* v. *Williams*, 256 F. 2d 152 (C.A. 5, 1958), reversing a Memorandum Opinion of this Court.

Therefore, that portion of the briquette building constructed by May 27, 1949, qualifies as a section 117(j) asset and the $1,400 gain must be subtracted from the $11,613.99 loss to the extent that the latter amount is allocable to construction completed by that date.

Construction of the briquette building began in April 1949 and the books and records of petitioner disclose that $4,103.42 had been expended upon construction by May 31, 1949, $475.67 having been expended by the end of April. These facts alone would be an insufficient basis upon which to make an accurate allocation as of May 27, 1949. However, the respondent's adjustment must be considered to have been founded upon a determination that at least $1,400 is allocable to the cost of construction up to that date. In the light of the facts before us, we cannot say that such an allocation was unreasonable. The burden is on petitioners to show that their cost was less than $1,400. The petitioners have not done so. Accordingly, the determination of the respondent on this issue is sustained.

*Issue 2.*

FINDINGS OF FACT.

On December 30, 1948, petitioners formed the Draper Trust. The original trust instrument provided in part as follows:

The said trustees are to use said trust fund for the purpose of constructing, maintaining and operating a building in the City of Colville, Washington, to be used exclusively by domestic fraternal societies operating under the lodge system and used exclusively for religious, charitable, scientific, literary or educational purposes; * * * All questions arising in connection with the administration of this trust are to be determined by a majority of said trustees and the action of a majority on all questions connected therewith shall be final.

Petitioners paid the following amounts to the Draper Trust during the taxable years 1948 and 1949:

| Date | Payment |
|---|---|
| Dec. 31, 1948 | $36, 000 |
| Dec. 30, 1949 | 12, 000 |

These amounts were deducted as charitable contributions on petitioners' income tax returns filed for those years.

Construction of the Draper Memorial Building was commenced in the early part of 1954 on a lot located opposite the county courthouse in Colville, Washington, and was completed later that same year. On November 15, 1954, the original trust instrument was amended by a supplemental trust agreement providing, in part, as follows:

Whereas, it is now desired between the parties hereto to enter into a Supplemental Trust Agreement wherein and whereby the said original Trust Agreement may be supplemented and clarified so as to set forth more exactly the intention which was embodied in the original Trust Agreement so as to remove any uncertainty with relation thereto for the future:

\*   \*   \*   \*   \*   \*   \*

It is especially agreed and understood that the said memorial building situated on the premises above named shall be known as the Draper Memorial and that it has been constructed and shall be used exclusively as a public meeting place for educational, scientific, charitable, religious or literary purposes, and that no part of the net earnings of said Draper Memorial shall, in any way, directly or indirectly, inure to the benefit of any private individual, firm or corporation, and that no substantial part of the activities of said Draper Memorial shall be for the purpose of carrying on propaganda or otherwise attempting to influence legislation.

It is specifically intended and herein understood that such Draper Memorial shall at all times be open exclusively for use by the general public. It is further agreed and understood that said Draper Memorial shall, at all times, be under the control and management, operation and maintenance of the trustees above named, or their duly elected or appointed successors, under such rules and regulations as may from time to time seem proper, reasonable and consistent with the express terms of this trust, and in accordance with existing laws and statutes.

On the basis of the trust agreement as amended in November 1954, respondent notified petitioners by letter dated April 19, 1955, that the Draper Trust was entitled to tax exemption as an organization described in section 501(c) of the Internal Revenue Code of 1954, and that contributions made to it would be deductible in computing taxable income as provided by section 170 of the 1954 Code.

Respondent determined that the contributions to the Draper Trust in 1948 and 1949 did not constitute contributions to a charitable organization since he determined that the trust as originally established was not to be used exclusively for religious, charitable, scientific, literary, or educational purposes, no part of which would inure to the benefit of private individuals.

### OPINION.

Respondent bases his determination on the fact that under the original trust agreement, pursuant to which the payments in question were made, the Draper Trust was to operate a building for use by domestic fraternal societies operating under the lodge system, which societies may not themselves constitute charitable organizations. He relies on Revenue Ruling 56–329, 1956–2 C.B. 126.

The sole dispute with respect to this issue is whether the use of the building in question by a domestic fraternal society would cause the Draper Trust to be disqualified as a charitable organization under section 23(o) of the 1939 Code. Section 23(o)(2)[4] and (5) provide:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(o) CHARITABLE AND OTHER CONTRIBUTIONS.—In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

\* \* \* \* \* \* \*

(2) a domestic corporation, or domestic trust, or domestic community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

\* \* \* \* \* \* \*

---

[4] Section 23(o)(2) of the 1939 Code was amended in 1949 to read:

(2). A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

(5) a domestic fraternal society, order, or association, operating under the lodge system, but only if such contributions or gifts are to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals;

Revenue Ruling 56–329, *supra*, relied on by respondent, states in part:

Charitable contributions as described in subsection (c) include those made by individuals to a domestic fraternal society, order, or association, operating under the lodge system, but only if such contribution or gift is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. Accordingly, it is held that contributions to an organization or fund to be used for the purpose of acquiring, erecting, and/or maintaining a building which is used by a fraternal organization in carrying on its fraternal and other activities, do not constitute contributions for exclusively charitable purposes, even though some of the activities in which the fraternal organization engages may be of a charitable nature. * * *

The statute quoted above specifically provides for the deduction of contributions to domestic fraternal societies, orders, or associations dependent solely upon the requirement that the contributions be used "exclusively for religious, charitable, scientific, literary, or educational purposes." The revenue ruling in question does not refer to the case where the fraternal organization uses the building exclusively for religious, charitable, scientific, literary, or educational purposes. The language of the trust instrument here involved requires the building "to be used exclusively by domestic fraternal societies operating under the lodge system and used exclusively for religious, charitable, scientific, literary, or educational purposes." Clearly the terms of the instrument limit the use of the building constructed by the trust to the defined charitable purposes.

Respondent argues that no evidence was introduced to indicate that the trust was operated exclusively for religious, charitable, scientific, literary, or educational purposes as required by section 23(o) of the 1939 Code. It is true that there is no direct evidence on this point, although we note that respondent ruled in 1955 that the Draper Trust qualified as an exempt organization. Be that as it may, prior to 1954 and during the years with which we are here concerned, the only activity of the trust was the receiving and holding of trust funds which were to be used in constructing the building in question and its subsequent operation. Under terms of the trust instrument, use of the building upon completion was to be limited to religious, charitable, scientific, literary, and educational purposes. Mere holding and accumulation of funds for charitable purposes does not disqualify the organization for treatment as a charitable organization. *Ohio Furnace Co.*, 25 T.C. 179 (1955) ; *Alan Levin Foundation*, 24 T.C. 15 (1955). We hold that the Draper Trust was a charitable organization as defined by section 23(o) of the 1939 Code during the years 1948 and 1949.

*Issue 3.*

FINDINGS OF FACT.

Petitioners, residents of a community property State, filed timely separate income tax returns for the calendar year 1944. Carrie Draper reported a total income of $13,960.84, $13,502.43 of which was indicated on her return to be one-half of the income from her husband's businesses. No schedule was attached or accompanied her return. Fred Draper reported $13,502.43 as his one-half share of the income from the operation of his businesses. In addition to his return, he attached a schedule which disclosed the following items, among others:

| Business | Mill | Farm | Rental |
|---|---|---|---|
| Sales | $400, 026. 22 | $22, 083. 93 | $2, 870. 76 |
| Cost of Sales | 339, 520. 22 | 12, 490. 36 | |
| Gross Profit | 60, 506. 00 | 9, 593. 57 | 2, 870. 76 |
| Overhead | 43, 789. 57 | 7, 503. 41 | 1, 930. 59 |
| Net Income | 16, 716. 43 | 2, 090. 16 | 940. 17 |
| Farm Income | 2, 090. 16 | | |
| Rent Income | 940. 17 | | |
| Other Income | 7, 258. 10 | | |
| Total Business Income | $27, 004. 86 | | |
| ½ Share | $13, 502. 43 | | |

On February 28, 1950, and March 1, 1950, Fred and Carrie, respectively, filed consents extending the period for assessment of income and profits taxes for the year 1944, and subsequent consents for that year, extending the period for assessment of the income and profits taxes to June 30, 1956. Respondent determined the deficiency in income taxes for the year 1944 and mailed the required notice on May 23, 1956. The deficiency was based on an adjustment to the closing inventory of the farm in the amount of $5,010, which had the effect of increasing income by that amount, and unreported income from the mill operations in the amount of $16,987.44.

OPINION.

. The consents signed by petitioners were without effect since they were signed subsequent to the running of the statute of limitations, unless, as respondent argues, petitioners have omitted income in excess of 25 per cent of that shown on the return with the result that, under section 275(c) of the 1939 Code, the 5-year period for assessment would be applicable. *Reis* v. *Commissioner*, 142 F. 2d 900 (C.A. 6, 1944), affirming a Memorandum Opinion of this Court.

Fred Draper reported total gross income from his businesses in the amount of $80,228.43. Expenses and overhead reduced this to

a net business income of $27,004.86. Since the reported gross income was $80,228.43, the 5-year rule applies if the omissions are in excess of 25 per cent of that figure, or $20,057.11. Respondent increased gross income from the farm by $5,010 and gross income from the mill by $16,987.44, a total adjustment of $21,997.44. However, the $5,010 adjustment to inventory and cost of sales does not constitute an omission from gross income. *Colony, Inc.* v. *Commissioner*, 357 U.S. 28 (1958). Therefore, the omissions from gross income amount to $16,987.44, an amount less than the required $20,057.12. While, as to Fred, these facts would be sufficient to make the 5-year rule inapplicable (*Reis* v. *Commissioner*, *supra*) and his consent without effect, we need not so hold in view of our holding under Issue 5 that Fred filed a false and fraudulent return for 1944. In view of the latter holding, the year 1944 is not barred as to Fred in any event.

Carrie Draper did not file a schedule with her return, but declared only the amount of $13,960.84 as her gross income. If she had filed the same schedule with her return as had Fred, the same rule would apply to her. However, she cannot require the Government to search carefully throughout a tax return of another taxpayer to ascertain her gross income. *Anna Eliza Masterson*, 1 T.C. 315 (1942), reversed on other grounds 141 F. 2d 391 (C.A. 5, 1944); *Corrigan* v. *Commissioner*, 155 F. 2d 164 (C.A. 6, 1946), affirming a Memorandum Opinion of this Court. The information contained in Fred's return is not considered part of her return or a schedule attached to her return for purposes of determining the 25 per cent of reported gross income. *Elvina Ratto*, 20 T.C. 785 (1953). Her gross income reported on the return for purposes of section 275(c) was $13,960.84. The omission from gross income attributable to the mill business totaled $16,987.44, one-half of which was properly includible in her return, or an omission from her return of $8,493.72, clearly in excess of the 25 per cent of the gross income reported on her return. The 5-year period provided for by section 275(c) is applicable and the consent filed prior to the running of that time was effective to extend the period for assessment of deficiencies in taxes for the year 1944 in the case of Carrie Draper.

*Issue 4.*

FINDINGS OF FACT.

Under date of June 13, 1951, the petitioners by and through their accountants transmitted the amount of $120,591.21 to the district director of internal revenue in Tacoma, Washington, in anticipation of a forthcoming assertion of tax deficiencies with respect to the years 1944 through 1948. This amount was deposited with the district director of internal revenue 5 years prior to the assertion of addi-

tional tax liability against petitioners. The amount deposited was placed in a suspense account in the district director's office (unclassified 9–B Account) where it remains to the present time, and has never been assessed or allocated to any tax liability.

Petitioners assert that this Court has jurisdiction to declare an overpayment of tax of the amount here in question on the ground that the 2-year period for refunds under section 322(b)(1) has never begun to run. Petitioners concede that if the amount paid was in fact a payment of a tax at the time it was deposited with the district director the 2-year statute of limitations would bar recovery of any part of the amount, but they maintain that it was never taken as a payment of any tax.

This Court has jurisdiction to find an overpayment of taxes under section 322(d) with respect to any year properly before it. However, no overpayment exists with respect to a particular fund until all or a part of that fund has been assessed or allocated to the payment of a tax. *Rosenman* v. *United States*, 323 U.S. 658 (1945). Since no part of the $120,591.21 has been assessed or allocated to the payment of a tax, no overpayment exists with respect to any part of that fund. *Rosenman* v. *United States, supra*.

*Issue 5.*

FINDINGS OF FACT.

Petitioner Fred Draper was born in 1883 and will be 76 years old in November 1959. He attended school in Iowa, but did not finish the eighth grade because of the necessity of working on the farm. After he had lost a foot in an accident, he attended business college for 3 months in Iowa. In 1910, he moved to a homestead 18 miles from the town of Colville, Washington, where he operated a stage until 1917. In 1913, he married Carrie Draper, petitioner herein. He acquired a sawmill in 1917 and in 1924 the Fred Draper Lumber Company was opened in Colville. At all times material hereto, and during the taxable years in question, Fred operated the Fred Draper Lumber Company.

From the outset of the lumber company, Carrie worked in the office assisting Fred in the conduct of the business. She assisted in keeping the records, particularly the records with respect to labor and working time. Neither Fred nor Carrie has ever prepared his or her own tax returns.

Fred actively managed the operations of the business and possessed a good understanding of the books of account. On occasion, he was able to instruct the bookkeeper in the proper manner of

making certain entries in the books of account. While Carrie occasionally helped out with the books at the office by keeping the time book, she did not work on the general books of account or the ledger. She did not perform any of the duties assigned to the bookkeeper and had no knowledge of these books.

Carrie continued to work in the office until 1943, when she and Fred separated. Difficulty between them had arisen after Fred recovered from an illness at which time Carrie attempted to persuade him to sell the business. Fred refused and Carrie, to protect her interest, attempted a settlement which failed. Subsequently, Carrie demanded her one-half of the community property on advice of counsel and whenever business property was sold she received one-half of the proceeds. After the separation, Fred moved to the ranch, and Carrie lived in a home in Colville, approximately 1 mile from Fred.

After they had separated, Carrie left the operation of the business entirely to Fred. However, she occasionally entered the office and looked into the books. On several of these occasions, she discovered some unrecorded invoices and tried to force the bookkeeper to record them. However, she did not examine the books of account proper.

Since 1942, Audrey Oehschlager, Carrie's sister, has been employed by the Fred Draper Lumber Company as accountant and bookkeeper. In this capacity, she maintained the general journal, general ledger, accounts receivable ledger, and other books of account. No other person has performed these duties since her employment except for brief periods during which she was on vacation.

During the years 1944 to 1949, the books of the Fred Draper Lumber Company consisted of the car record books, a general journal, a general ledger, and an accounts receivable ledger. When an order for lumber was received, the order was given to a stenographer who typed the order and placed it in a manila folder with a number. One copy of the order stayed in the folder, two copies were sent to the plant man who in turn sent one copy to the shipping clerk. After the car was shipped, the scale with the car number on it would be brought to the office of the Fred Draper Lumber Company and the car would be billed and the invoice sent to the purchaser. A copy of the invoice remained in the folder. Invoices were charged in the general journal and the total went to the general ledger at the end of the month. The invoices were numbered consecutively and the folder was placed in a file in the vault where it was kept in order.

After an invoice was transmitted to the purchaser and the money was received, the money went to the bookkeeper. Each invoice was usually given to Fred Draper for approval before it was entered in the books.

Beginning in 1943 or 1944, Fred found his lumber business short of cash. It appeared to him that some of the proceeds, if not all, from the sale of community property would be needed to keep the business going. However, he was faced with the prospect of distributing one-half of all proceeds of sales to Carrie. To avoid this, he devised a plan whereby certain sales would not be recorded. This scheme was to be accomplished by withdrawing certain invoices so that they would not find their way into the company books. When payment was received for the invoices which had been withdrawn in this manner, Fred took the payment and deposited it in his own special account. On occasion, such payments would cover more than one invoice, some of which had been recorded. When this occurred, Fred cashed the check and deposited the amount representing the recorded sale in the company's account and informed the bookkeeper, Audrey Oehschlager, of the payment to that extent.

The invoices which were prepared by other employees were always given to Fred before transmission to the bookkeeper. After reviewing them, Fred gave them to the bookkeeper to post in the journal and accounts receivable ledger. At no time did he ever advise her that he was withholding any of the invoices. However, she eventually became aware of this procedure. Occasionally, a customer's account would appear to be long overdue and she would inform Fred of the fact. He would then make a remittance to the company bank account himself and give her a duplicate of the deposit ticket.

With respect to the remittances received on sales invoices, Fred always opened the mail himself, except during brief absences. The checks were given to Audrey Oehschlager for posting to the account books after they were handled by Fred. She was never advised that certain checks were being held out by him. Nor was she ever told of any reason for their being held out. She did know that Fred had a personal bank account but not the nature of the deposits to that account.

The procedure described above with respect to the handling of certain invoices, remittances, and deposits was followed by Fred during all of the years in question.

Petitioner retained a licensed public accountant, Martin Palmquist, who had been represented to him as a man with knowledge of taxes, to prepare his tax return for 1944, 1945, and 1946. Sometime late in 1945, petitioner discussed with Palmquist the difficulty he had with Carrie and his desire to hide certain of the receipts from her. Palmquist told petitioner that if he would tell him the amount of the withheld receipts each year, he, Palmquist, would take care of it on the books at the end of the year.

Petitioner informed his accountant, Palmquist, of the omitted sales only for the year 1945 when he gave him the figure of $18,704.73 as

the amount of omissions for the year. Palmquist then made an entry in the ledger adjusting log expense (reducing the cost) and increasing the stock account by $13,704.73 and debiting notes payable by the amount of $5,000. These adjusting entries had the effect of increasing taxable net income by $18,704.73. Fred did not inform Palmquist of the omissions for the other years. Palmquist prepared the tax returns for the Drapers during the 1944, 1945, and 1946 period.

When Palmquist closed petitioner's books at the end of the year, he took a trial balance prepared by Audrey Oehschlager and from it he posted the books of account, making notations on the trial balance.

After the 1946 tax returns had been filed for Fred and Carrie with the help of Palmquist, the bookkeeper attempted to balance the books from the adjusting entries made by Palmquist. She found it impossible. Consequently, petitioner attempted to have Palmquist explain the entries and balance the books, but when Palmquist would not spend the time with petitioner's books, Fred decided to obtain a new accountant to handle his year-end statements, and tax returns. With this in mind, he contacted the firm of Morris & Lee, then known as A. William Morris & Co., a certified public accounting firm in Spokane, licensed to practice in the State of Washington. Petitioner sought the aid of Gordon Lee, a partner in Morris & Lee, then a senior accountant with the firm. He discussed his problem with Lee and indicated the fact that the books did not contain all of the sales and receipts of the lumber business, that approximately $40,000 of income was involved, and of the arrangement he had with the previous accountant, Palmquist. Lee told petitioner that he should have his books put into correct order. Lee thereafter made one visit to the Fred Draper Lumber Company but did not do any work with respect to the books. An accountant with the firm named Haines was assigned to the task of correcting the books of the lumber company and of making any necessary adjustments to petitioner's tax returns. Haines did not discuss the matter with petitioner, but did talk to the bookkeeper. Between August 11 and August 16, 1947, Haines conducted an audit of petitioner's books. He did not make use of the car record book even though it was available to him at all times. The car record book was the only book maintained in the Fred Draper Lumber Company which recorded almost all of the invoices and receipts. Work papers of this audit carried the following comments initialed by Haines under date of August 15, 1947:

11. Why was a "note payable" closed off as an offset against "Log costs" in closing books for *1945*?

Mr. Draper tells me that $24,000 of this was from the sale of the 2 service stations and the waters property. Palmquist handled this O.K. in Dec., 1946 page 402.

Spec. note:—Mr. Draper reported that a few years ago he and wife divided about $40,000.00 that they received from the sale of some assets which was not reported in their FIT returns and subsequent earnings from that cash was not reported. I asked him to give me a detailed list of these transactions and he said he would—but he did not get it ready and I forgot to ask him for it when I left.

Haines finished his audit of the Fred Draper Lumber Company books in about 1 week and then left Colville for Spokane, Washington, from where he made his report. He had not talked with either Fred or the bookkeeper before leaving for Spokane. His audit included the 1945 and 1946 income tax situation of the company.

Petitioner continued to correspond by mail with Palmquist because he did not understand fully the state of the records or the tax returns which had been filed. He attempted to find out whether the correct amounts of tax had been paid for the years for which Palmquist had prepared the returns. Palmquist usually replied and indicated that everything was either in proper order or would be corrected in later years.

Subsequent to Haines' departure, Morris & Lee sent Max Cook, one of its accountants to make another audit of the books covering the years 1945 and 1946. The car record book was at his disposal at all times but he likewise failed to make use of it to check the accuracy of the account books. In auditing petitioner's 1945 and 1946 income tax returns, Max Cook discovered the discrepancy in the journal entry made by Palmquist for the year 1945 and, upon adjustment, filed amended income tax returns and claims for refund for that year and filed additional amended returns and claims for refund for 1946 on December 31, 1948. Additional amended returns and claims for refund for the year 1947 were filed on July 13, 1949, for both petitioners. Cook was given no special instructions regarding his work and did not use the car record book in determining the refund claims. The refund claims were made out by Cook in Spokane and forwarded to Fred and Carrie for signature with instructions to return the claims to Morris & Lee for filing. Both Fred and Carrie signed the amended returns and claims and returned them to Morris & Lee without questioning the basis for them. Fred did not understand the nature of the audits and claims filed. He assumed that the accountants had audited the car record book and had corrected any errors appearing in the journal and ledger.

Prior to Thanksgiving 1949, a revenue agent by the name of Tillman made a visit to the Fred Draper Lumber Company to investigate the refund claims which had been filed by Cook for Fred. Fred was not able to discuss the claims with Tillman since he had not questioned the claims or discussed them with Cook. Some discussion was had between Fred and Tillman concerning the $18,704.73 reversing entry

which Palmquist had made on the books for the 1945 taxable year. After Tillman left, Fred contacted Gordon Lee and requested him to make a trip to Colville to look into the records and discuss the refund claims. When Lee refused, Fred decided to prepare papers for the use of the revenue agents upon their return, and he reviewed the records to determine what sales, if any, had been omitted from the returns. From the car record book he made a list of the sales not reported for the years 1944 through 1948. The list was turned over to Tillman when he returned.

A short time after Tillman's second visit to the lumber company office, Special Agent Savage and Revenue Agent Pearson began an investigation of the books, including the car record book, in preparation for a possible fraud prosecution. Amended income tax returns were prepared for Fred by Vic Cole of the firm of Morris & Lee for the taxable years 1944 to 1948, inclusive. These returns were not prepared at Fred's initiative and he was merely asked to sign them, which he did. The amended returns for the years 1944 through 1948 were filed on June 13, 1951.

Petitioners' gross income for the years 1944 through 1949 as disclosed by their original returns and their unreported income as determined by the respondent for the years 1944 through 1948 are as follows:

| Year | Gross income | Unreported income |
|---|---|---|
| 1944 | $80, 228. 43 | $16, 987. 44 |
| 1945 | 95, 478. 76 | [1] 19, 368. 83 |
| 1946 | 109, 131. 88 | 5, 400. 77 |
| 1947 | 221, 997. 60 | 43, 776. 97 |
| 1948 [2] | 429, 044. 12 | 59, 077. 51 |
| 1949 [2] | 189, 427. 29 | ---------- |

[1] As found above, this amount was offset to the extent of an $18,704.73 intentional reduction of cost.
[2] Joint returns.

The adjustments which gave rise to the increase in net income, as stated in the deficiency notice, for each of the years in question are as follows:

1944:

| | |
|---|---|
| Mill income unreported | $16, 987. 44 |
| Excess depreciation | 1, 533. 22 |
| Farm income increase due to overstated cost-inventory add | 5, 010. 00 |
| **Total** | 23, 530. 66 |

1945:

| | |
|---|---|
| Farm income increase due to inventory add-cost down | 1, 660. 00 |
| Mill income unreported | 19, 368. 83 |
| Excess deductions (excess depreciation, OPA penalty, asset charge [1]) | 11, 446. 03 |
| Understated costs | (18, 704. 73) |
| **Total** | 13, 110. 13 |

See footnote at end of table.

1946:
 Farm income increase:

| | |
|---|---:|
| Inventory adjustment | $5,525.00 |
| Asset charge [1] | 3,185.90 |

 Mill income increased:

| | |
|---|---:|
| Unreported income | 1,233.27 |
| Asset charge [1] | 12,397.88 |
| Depreciation | (841.90) |
| Dividends | 593.86 |
| Interest | 73.64 |
| Capital gain unreported | 4,347.58 |
|   Total | 26,515.23 |

1947:
 Farm income increase:

| | |
|---|---:|
| Inventory charge | 4,810.00 |
| Depreciation charge | (318.59) |

 Mill income increase:

| | |
|---|---:|
| Unreported income | 43,776.97 |
| Asset charge [1] | 720.78 |
| Depreciation charge | 2,115.65 |
|   Total | 51,104.81 |

1948:

| | |
|---|---:|
| Charitable deduction | 36,000.00 |

 Farm income increase:

| | |
|---|---:|
| Asset charge [1] | 3,435.21 |
| Inventory adjustment | (530.00) |
| Depreciation | (687.04) |

 Mill income increase:

| | |
|---|---:|
| Unreported income | 58,419.66 |
| Cost of sales | 2,000.00 |
| Capital gain unreported | 569.34 |
| Dividends | 365.00 |
| Interest | 8.18 |
|   Total | 99,580.35 |

1949:
 Farm income:

| | |
|---|---:|
| Inventory corrections | (2,800.00) |
| Depreciation charge | (687.04) |
| Capital gain adjustment | (700.00) |
| Mill income: Capital gain to casualty loss charge | 1,400.00 |
| Charitable deduction | 12,000.00 |
|   Total | 9,212.96 |

[1] Improper chargeoff of an asset as an expense.

Fred was indicted in the United States District Court for the Eastern District of Washington and tried for criminal tax evasion for the taxable years 1945, 1947, and 1948. The trial jury was unable to return a verdict for 1947 and 1948 and returned a verdict of not guilty for the taxable year 1945. The United States did not attempt

to retry Fred. Respondent determined deficiencies in petitioners' income taxes and additions to the taxes for all years involved on May 23, 1956.

Carrie did not file false and fraudulent income tax returns for the years 1944 through 1947 with the intent to evade and defeat the tax. Determination of the deficiencies as to both Carrie and Fred for the year 1945 was made more than 3 years after the filing of the returns. With respect to Carrie, deficiencies for the years 1944, 1946, and 1947 were determined within the statutory periods as extended by timely waivers filed by her.

Fred filed a false and fraudulent income tax return for the year 1944 with the intent to evade and defeat the tax. He did not file fraudulent income tax returns for the years 1945, 1946, and 1947. Determination of the deficiencies for the year 1945 was made more than 3 years after the filing of the return. Deficiencies for the year 1946 were determined within the statutory period as extended by timely waivers filed by Fred. The determination of deficiencies for the year 1947 was made after the statutory period as extended by waivers filed by Fred.

Fred and Carrie did not file a fraudulent joint income tax return for the year 1948. The determination of deficiencies for the year 1948 was made after the statutory period as extended by waiver timely filed by them.

#### OPINION.

Petitioners omitted sums from their gross incomes in each of the years 1944 through 1948. The omissions were due solely to the action of petitioner Fred Draper. Sometime in 1943 or 1944, Fred was wary of the capital position of the lumber business and thought there would be a need for as much cash as could possibly be obtained. Because of this need for capital, he decided to do what he could to retain all or most all of the company receipts in the business. This purpose was in fact accomplished by intentionally withholding invoices and receipts from the bookkeeper so that the sale would not appear on the company records. Admittedly, the car record book was accurate and reflected all deliveries, but this was not the basic accounting book. The bookkeeper did not depend upon the entries in it to check the accuracy of her records and it was this fact which Fred knew would enable him to conceal income. Finally, the tax returns were filed on the basis of the inaccurate records. In this manner Fred knowingly filed a false income tax return for the year 1944, with the intent to evade the tax. To the extent that the full amount of tax due was not paid, Fred managed to accomplish his purpose of conserving company capital.

Fred argues that his sole intent was to deprive his wife, Carrie, of her share of the company profits and that this fact does not form the

basis of fraudulent intent to evade taxes. However, intentionally understating income for tax purposes was as much the means of conserving income as defrauding his wife. He knowingly kept false books. He knew that his 1944 income tax return was prepared on the basis of those false books and, with respect to that year, he made no effort to make, or to cause to be made, any adjustment in his false accounts so that the return would correctly reflect income. The fact that he may have intended to defraud his wife and to set up a reserve fund for himself does not alter the fact that he knowingly understated his income for 1944 with intent to evade the tax. Cf. *Emilie Furnish Funk*, 29 T.C. 279 (1957), affirmed on this issue sub nom. *Furnish* v. *Commissioner*, 262 F. 2d 727 (C.A. 9, 1958); *Jack M. Chesbro*, 21 T.C. 123 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956); *Morris Lipsitz*, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955).

Sometime late in 1945, and subsequent to the time that the income tax returns for 1944 had been filed, Fred discussed his problem with his accountant, Palmquist, and disclosed to Palmquist the fact that he, Fred, had been withholding certain invoices and receipts from the company books. Palmquist requested that Fred give him the amounts withheld at the end of the year and declared that he would take care of it on the books. For the taxable year 1945, Fred prepared a list of sales which he thought included all of those not recorded and handed it to Palmquist. The unrecorded sales, as computed by Fred, amounted to $18,704.73. Palmquist then made the journal entry which had the effect of increasing the net income as shown on the books of account. Although there was in fact $19,368.83 of sales still unrecorded after the entry by Palmquist, and the amount of gross income as stated on the return was understated by that amount, Fred had reason to believe and understood that the actual net income and tax computations were accurate. Fred's activity with respect to the tax return for 1945 indicates clearly that he attempted to pay the correct amount of tax due for that year. This does not constitute the fraudulent intent to evade the tax for that year which is necessary to the imposition of the addition to tax pursuant to section 293(b) of the 1939 Code. Therefore, he is not liable for the addition to tax imposed by that section.

Once Fred had explained his situation to Palmquist, he attempted to place the burden of reporting accurately upon his accountant. However, a taxpayer cannot thus relieve himself of the responsibility to file correct and accurate tax returns. *American Properties, Inc*, 28 T.C. 1100 (1957), affirmed per curiam 262 F. 2d 150 (C.A. 9, 1958); *Vern W. Bailey*, 21 T.C. 678 (1954); *Estate of Louis L. Briden*, 11 T.C. 1095 (1948). Nevertheless, the assumption by the taxpayer that his accountant was reporting his income accurately, the actions of the taxpayer showing that he actually thought this to be the fact.

together with the facts that he attempted to have his accountant correct the books and that he finally replaced that accountant by a reputable firm to handle his books, lead us to the conclusion that, whatever his intent in 1944, he had no intent to evade taxes subsequent to that time. After 1944, he made no attempt to hide information from his accountants but informed them of his peculiar accounting methods and evidenced an intention to have them correct his records for tax purposes. We are satisfied that all the facts taken together evidence an absence of fraudulent intent at the time the returns were filed for the years subsequent to 1944. Therefore, in the light of all the facts, we hold that petitioner Fred Draper abandoned his course of intentionally understating his income for the purpose of evading the tax after the taxable year 1944. This holding includes the years 1945 through 1948.

As a result of our findings of fact with respect to whether or not Fred and Carrie filed false and fraudulent returns and with respect to the period within which determination of the deficiencies were made by the respondent, we hold that assessment of the tax for the years 1945 and 1948 is barred by the statute of limitations as to both Carrie and Fred (sec. 275(a)), that the assessment of the tax for the year 1947 is barred by the statute of limitations as to Fred (sec. 275(a)), that assessment of the tax for the years 1944 and 1946 as to both Fred and Carrie, and for the year 1947 as to Carrie, is not barred by the statute of limitations (sec. 276(b)).

Reviewed by the Court.

*Decisions will be entered under Rule 50.*