MADISON NEWSPAPERS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6134–64. Filed March 24, 1967.

*Thomas G. Ragatz*, for the petitioner.
*Myron A. Weiss*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's income tax for its fiscal year ended September 30, 1962, in the amount of $28,077.40.

The sole issue raised is the applicability of the investment credit contained in section 38 [1] to three units of a printing press installed in petitioner's publishing facilities.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of the State of Wisconsin having its principal office in Madison, Wis. Petitioner is engaged in the business of publishing newspapers and has never engaged in the business of installing, constructing, or erecting printing presses.

Petitioner kept its books and filed its returns utilizing the accrual method of accounting on the basis of a fiscal year ending September 30th. Petitioner's return for the year ended September 30, 1962, was filed with the district director of internal revenue for the district of Milwaukee, Wis.

On November 3, 1960, the petitioner and the Goss Co., a division of Miehle-Goss-Dexter, Inc., located in Chicago, Ill., entered into a sales agreement covering an eight-unit printing press which was described as a "New Goss Headliner Mark I printing press, manufactured in accordance with Goss Specifications 606–311–1, Reels, Tensions, Pasters with paster pilots in accordance with Specifications 384–266–1."

The price was $843,702 f.o.b. Goss' place of manufacture, subject to certain price adjustments and financing terms. The sales agreement contained the following pertinent provisions:

4. SHIPMENT

Goss shall have the machinery ready for shipment as follows: June-July, 1961.

\*  \*  \*  \*  \*  \*  \*

5. INSURANCE

\*  \*  \*  \*  \*  \*  \*

B. Immediately upon delivery of the machinery to Buyer, and until all Buyer's obligations hereunder have been fully performed, Buyer will keep the machinery insured with insurers acceptable to Goss against fire and extended coverage perils to the full amount of the unpaid purchase price, loss, if any, to be paid to Goss as its interest may appear. \* \* \*

\*  \*  \*  \*  \*  \*  \*

6. FREIGHT—ERECTION—TAXES

A. Buyer shall pay all freight charges and costs of cartage and handling at destination, and shall furnish, at Buyer's expense and sole responsibility for labor performance and material quality, all labor (other than erectors as set forth in paragraph 7) and all materials and incidentals including electric wiring, plumbing, etc., required to erect, start, test and adjust the machinery. Crating and shipping materials and erection tools and other equipment supplied by Goss for erection, testing and adjusting shall remain the property of Goss, but Buyer shall pay all costs of shipping thereof to and from Buyer's plant, except for crating material which will be returned to the Goss plant only at the option and expense of Goss.

\*  \*  \*  \*  \*  \*  \*

### 7. ERECTORS

Goss shall furnish and Buyer shall engage, at Buyer's expense, competent personnel, including an electrical expert should the machinery include reels, tensions, and pasters (all such personnel herein sometimes called "erectors") to supervise the erection, starting, testing and adjustment of that part of the machinery manufactured by Goss. Erection personnel shall be retained at Buyer's expense throughout the period of erection, starting, testing and adjustment, and until the machinery is accepted by Buyer. If Buyer desires, the erectors shall assist with the installation of auxiliary equipment not manufactured by Goss, but Goss shall not be responsible for the installation thereof. Buyer shall pay currently each week for services, transportation, board and lodging of erectors from the time of their departure from the plant of Goss until their return thereto at the prevailing rates of Goss for such erectors, and subject to the then existing rules and customs of Goss as to working conditions and overtime.

### 8. TESTING

A. Buyer shall test the completed machinery within 15 days after Buyer has been notified by Goss that in the opinion of Goss the machinery is ready for commercial operation and acceptance. Buyer shall notify Goss in writing within such 15 days of any claims that the machinery fails to comply with specifications of Goss. Goss shall have a reasonable time thereafter to remedy any defect.

### 9. GUARANTEE

Goss guarantees that the machinery will be built in accordance with the description set forth in paragraph 1. Within one year after shipment Goss will repair or replace without charge, f.o.b. Goss' plant, any materials or parts found by Goss to be defective. All warranties of Goss, expressed or implied, are limited to repair and replacement of materials or parts of its own manufacture. In no event shall Goss be liable for loss of anticipated profits or consequential damages.

\*     \*     \*     \*     \*     \*     \*

### 11. TITLE

A. Until all amounts to be paid by Buyer hereunder are paid in full, the machinery shall remain the personal property of Goss, irrespective of the extent to which or manner in which the machinery may be affixed or attached to any property.

Five units were installed prior to October 1961 and are not involved herein. The three units at issue were delivered at Madison, Wis., prior to the end of July 1961. Petitioner paid the freight charges from Chicago. The three units were stored in a warehouse in Madison. Petitioner paid the warehouse charges but was later reimbursed by Goss because Goss shipped the units earlier than the time that had been orally agreed upon by petitioner and Goss. A portion of the reimbursed storage charges included the month of January 1962.

Goss Co. personnel did some work on the components of the three units while they were in the Madison warehouse.

Petitioner insured the three units against fire and extended coverage perils from the time of delivery to the warehouse in Madison, naming Goss as beneficiary in accordance with the sales agreement.

Petitioner hired H. L. Luloff, a retired employee of petitioner, to supervise a professional erection company that was employed by petitioner for the purpose of expediting installation of the complete press by altering petitioner's building and removing the old press. His services were confined to such alteration and removal and were completed on or before December 31, 1961.

Installation of the three units began on November 27, 1961.

All major pieces of the three units were on the premises of Madison Newspapers, Inc., but installation thereof was not completed, on or before December 31, 1961. Petitioner had paid a large portion of the purchase price and had incurred expenses in connection with installation of the three units of $42,541.91 by December 31, 1961.

The three units were not available to petitioner for operational use before January 30, 1962.[2]

Seymour R. Johnson, an employee of Goss, was sent by Goss to supervise the installation of the three units. Petitioner reimbursed Goss for Johnson's salary and paid Johnson directly for his expenses in connection with the installation. Petitioner provided other personnel to assist in the installation by Goss and paid their compensation and other expenses.

The three units constitute depreciable, tangible personal property necessary to the operation of the petitioner's business with a useful life of 8 or more years.

The three units were items of new machinery and their original use was by the petitioner and occurred after December 31, 1961. They were placed in service by the petitioner during its fiscal year ending September 30, 1962.

Petitioner's tax return for the fiscal year 1962 included a claim for $28,077.40 of investment credit on the three-unit section of its new printing press which cost $401,105.63.

OPINION

This case involves the question whether petitioner is entitled to an investment credit under section 38 for three units of an eight-unit printing press. Petitioner makes no claim with respect to the other five units and respondent concedes that, if petitioner is entitled to any credit, the amount is as claimed. We have found that the property was "new" in the sense that its first use was by petitioner

---

[2] The first unit began publishing on Jan. 30, 1962, the second unit on Feb. 2, 1962, and the final unit on Feb. 5, 1962.

and that it was first placed in service by petitioner during its fiscal year ending September 30, 1962, so that the credit, if available, was properly claimed by petitioner in that taxable year. Sec. 46(c). Thus, the issue before us is a narrow one and turns upon whether the three units constitute "new section 38 property" within the meaning of the following provisions of section 48(b) :

> (b) NEW SECTION 38 PROPERTY.—For purposes of this subpart, the term "new section 38 property" means section 38 property—
>> (1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or
>> (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.
> In applying section 46(c) (1) (A) in the case of property described in paragraph (1), there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961.

Respondent relies upon his regulation, sec. 1.48–2(b) (6), Income Tax Regs., which states that "Property shall be deemed to be acquired when reduced to physical possession or control." He argues that petitioner had possession of the three units prior to January 1, 1962, on the basis of the following:

(1) Petitioner paid the freight from Goss' place of business;

(2) By July 1961, the three units had been delivered to a warehouse in Madison, Wis., where petitioner's principal place of business was located;

(3) Petitioner paid the warehouse charges, although it was later reimbursed by Goss;

(4) Petitioner insured the units, although the policy named Goss as a beneficiary to assure payment of the sums due;

(5) All three units had been delivered to petitioner's place of of business by December 31, 1961;

(6) By December 31, 1961, petitioner had paid a large portion of the purchase price of the units.

Respondent also contends that petitioner had *control* over the units prior to January 1, 1962, as evidenced by the fact that petitioner, directly or indirectly, paid the salaries of all those connected with the installation of the units and allegedly could have, at any time, dismissed any of those so working.

Petitioner counters by arguing that in order to have possession one must also have control and that it did not have control of the three units until they were ready for commercial operation and acceptance; that Goss, and not petitioner, had the primary responsibility of installation, although petitioner was to pay all expenses; and that petitioner bought installed units of a printing press and not component parts thereof, so that the presence of each of the three uninstalled units at petitioner's place of business by December 31, 1961, is immaterial.

Unfortunately, there is nothing in the legislative history that is of direct help to us in resolving the issue before us. Congress enacted the investment credit provisions of the Code as part of the Revenue Act of 1962 in an attempt to stimulate investment so as to contribute to economic expansion. See H. Rept. No. 1447, 87th Cong., 2d Sess., p. 7 (1962) ; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 10, 11 (1962). But this background is of limited significance in determining whether an investment made before the legislation became law should or should not qualify. Any given cutoff date has an inherently arbitrary effect even though there are articulated motivations for its selection. See page 637, *infra*.

Congress did, however, clearly state that, in determining whether property was "acquired after December 31, 1961" within the meaning of section 48(b)(2), the principles applicable with respect to depreciation under section 167(c) were to be applied. See H. Rept. No. 1447, *supra* at A21; S. Rept. No. 1881, *supra* at 158. Respondent faithfully charted this course in promulgating section 1.48–2(b), Income Tax Regs, which adopts the governing rule under section 167(c). See sec. 1.167(c)–1, Income Tax Regs. As has been previously stated, section 1.48–2(b) provides that "Property shall be deemed to be acquired when reduced to physical possession or control."

This regulation, however, is directed for the most part, as is respondent's argument herein, on the *when* of possession or control and fails to deal with the nature of the property subject to these powers. Undoubtedly petitioner herein did have "possession or control" of something on or before December 31, 1961, but the critical question requiring resolution is possession or control of *what*.

The fact that the major pieces of the three units were physically present at petitioner's place of business on or before December 31, 1961, is not determinative. Nor is the fact that on or before that date petitioner paid the freight and insurance (which named Goss as a beneficiary), the expenses of installation, or a large portion of the purchase price. Respondent's regulations specifically provide that payment is not the touchstone. Sec. 1.48–2(c), example (3), Income Tax Regs.

Respondent relies most heavily on the fact that, except for Seymour Johnson, petitioner hired the personnel who worked on the installation of the units and paid their salaries and expenses as well as those of Johnson. He contends that under the agreement Goss disclaimed any responsibility for the erection and installation of the units and merely undertook to provide petitioner with access to the necessary supervisory personnel. We disagree. In point of fact, sections 6 and 7 of the agreement in combination make it clear that Goss was responsible for the work of "erectors," i.e., supervisory personnel. Moreover, if

Goss intended that its responsibility was to be so limited, we believe that it would have excepted installation from its guarantee and warranties.[3]

We think that good business reasons dictated the provisions governing installation: (1) To avoid Goss' having to estimate the costs of installation in petitioner's plant and including that cost in the quoted price of the press and (2) to save on labor costs since Goss was in Chicago, Ill., and petitioner in Madison, Wis.

We do not have before us a situation calling for an allocation of the time of acquisition to various parts of the property such as is involved in the determination of the holding period of a building for the purpose of determining long-term or short-term gain. *Paul* v. *Commissioner*, 206 F. 2d 763 (C.A. 3, 1953); *Fred Draper*, 32 T.C. 545 (1959). Indeed, the legislative history of section 167(c), which is the admitted progenitor of section 48(b), indicates clearly that a comparable allocation is appropriate only in determining whether section 48(b)(1) applies. Thus, in enacting section 167(c), the Senate sought to make *completion* after December 31, 1954, the sole test for the purpose of determining whether accelerated depreciation applied. See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 28–29, 202 (1954). The conference committee specifically rejected this proposal and returned to the dichotomous pattern of the House bill so that, for purposes of depreciation, an allocation of cost is made only with respect to that portion of property "constructed, reconstructed or erected" on or before the critical date.[4] H. Rept. No. 2543, 83d Cong., 2d Sess, p. 29 (1954). The various committee reports dealing with sections 167(c) and 48(b) indicate clearly that Congress was aware of the difference in treatment resulting from this dichotomous pattern. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A49 (1954); S. Rept. No. 1622, *supra* at 202; H. Rept. No. 2543, *supra* at 29; H. Rept. No. 1447, *supra* at A21; S. Rept. No. 1881, *supra* at 158; cf. sec. 48(a)(1)(C), I.R.C. 1954, and sec. 1.179–3(c)(1) and (2), Income Tax Regs.

Thus, Congress in effect adopted the rationale of *Paul* v. *Commissioner*, *supra*, and *Fred Draper*, *supra*, and enacted section 48(b)(1) to cover the type of situation involved therein—namely, where a building is not only erected on, and affixed to, a taxpayer's land but is also

---

[3] Goss specifically denied responsibility for the installation of "auxiliary equipment" but did not do so as to machinery sold by it.

[4] Following the pattern established by the regulations respecting accelerated depreciation (see sec. 1.167(c)–1, Income Tax Regs.) and with due regard for the course outlined by the committee reports respecting sec. 48(b) (see H. Rept. No. 1447, *supra*, and S. Rept. No. 1881, *supra*), sec. 1.48–2(b) of respondent's Income Tax Regs. provides that—
"property is considered as constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with *his* specifications. '[Emphasis added.]"
Since we have found that the three units were built and installed in accordance with Goss' rather than petitioner's specifications, sec. 48(b)(2) is applicable and we have no reason to consider the application of sec. 48(b)(1) or the regulations thereunder.

constructed in accordance with his specifications. Moreover, realistically, there is a marked difference between a half-completed building and a half-completed machine.

The underlying essential fact is that petitioner contracted for and Goss agreed to furnish three *installed* units of a printing press and not an uninstalled assortment of components thereof. This is the clear import of the provision in the agreement that Goss was to furnish installation personnel, albeit at petitioner's expense, and that the three units were to be tested after *notification to petitioner* by Goss that they were "ready for commercial operation and acceptance."

We conclude that the *what* in this case was three *installed* units of a printing press and that these were the property with respect to which "physical possession, or control" and therefore time of acquisition should be measured.[5] The installation herein was a complex operation requiring extensive time to perform. Whether an acquisition of installed property, where the installation involved a mere turning of a few screws or hooking up of some wires or pipe, would be entitled to similar treatment we need not and do not now decide.

While the record does not etch the progress of the installation of the three units with the utmost precision, we think it clear that they were not installed until well after January 1, 1962. Therefore, the property to which the investment credit applied was not in existence until after that date.

One final word. The installation of the three units proceeded in normal fashion consistent with business exigencies. There is not the slightest suggestion in the record that it was delayed beyond December 31, 1961, in order to enhance petitioner's chance of becoming entitled to the investment credit. Indeed, during the latter part of 1961, petitioner had reason to believe that the cutoff date would be December 31, 1960. See General Explanation of Committee Discussion of Revenue Bill of 1961, Joint Committee on Internal Revenue Taxation, p. 7 (Sept. 29, 1961). The bill providing for a December 31, 1961, cutoff date (H.R. 10650) was not introduced until March 12, 1962, well after the time the installation of the three units was completed In this connection, respondent has contended that allowing petitioner the benefit of the investment credit results in a windfall because it was not anticipated by petitioner at the time it entered into the agreement with Goss, i.e., November 3, 1960, and, therefore, it in no way fulfills the purpose of the statute, i.e., stimulation of investment. It is sufficient to note that Congress did not make the contract date the determining factor, that the possibility of an invest-

---

[5] The time of acquisition is to be distinguished from the time the property is "placed in service," which is the effective determinant with respect to the taxable year for which the investment credit can be taken. Sec. 46(c).

ment credit was the subject of public discussion for some time prior to its enactment, and that it was for this reason that the bill, as finally enacted, retained the December 31, 1961, date as originally provided by the House of Representatives rather than the June 30, 1962, date contained in the Senate version. See statement of Senator Kerr, floor manager of the Revenue Act of 1962 in the Senate; S. Rept. No. 1881, *supra* at 13.

We hold that under both the statute and respondent's regulations petitioner is entitled to an investment credit as claimed for its taxable year ending September 30, 1962.

In order to reflect other adjustments (including an adjustment for depreciation on the three units, which petitioner concedes was not allowable for any period prior to Feb. 1, 1962),

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

[1] All references are to the Internal Revenue Code of 1954.