FORT HOWARD PAPER COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ft. Howard Paper Co. v. Commissioner
Docket No. 2982-74.
United States Tax Court
T.C. Memo 1977-422; 1977 Tax Ct. Memo LEXIS 20; 36 T.C.M. (CCH) 1711; T.C.M. (RIA) 770422; December 12, 1977, Filed *20 (1) P was engaged in the manufacture and distribution of disposable paper products. Its deductions for depreciation on its buildings were computed by using a 28-year composite useful life, based on its claim of anticipated obsolescence. Held, P's evidence did not establish anticipated economic obsolescence; the Commissioner's determination of a 43-year composite useful life is sustained. (2) For 1970, P claimed an investment credit for an addition to its power plant, including a locker-washroom and turbine room. Held, the locker-washroom was a building within the meaning of sec. 48(a)(1)(B)(i), I.R.C. 1954, and did not qualify for the investment credit. Held, further, the turbine room was a special use structure within the meaning of sec. 1.48-1(e)(1), Income Tax Regs., placed in service during 1970, and qualified for the investment credit. (3) In March 1970, P ordered a papermaking machine, some components of which were delivered prior to Aug. 15, 1971. P claimed an investment credit based on the total cost of the machine. Held, under its contract with the seller, P purchased only the components of a machine, not an installed machine; no investment credit was allowable for machine *21 components delivered prior to Aug. 15, 1971. Sec. 50(a)(2), I.R.C. 1954. (4) In January 1970, P placed an order for the rebuilding of a roll grinder; the actual work of rebuilding was commenced after March 31, 1971, and completed before Aug. 15 of such year. Held, no investment credit is allowable for the cost of rebuilding the roll grinder. Sec. 50(a)(1), (2), I.R.C. 1954. (5) Held, the Commissioner's determination that a freight elevator was a building component with a useful life of 20 years is sustained. (6) Held, P failed to prove that the Commissioner abused his discretion in disallowing part of its additions to its reserve for bad debts for 1970 and 1971. (7) In 1972, part of the roof of one of P's buildings, then under construction, collapsed. P commenced litigation against its insurance company and the contractors involved in the construction of the roof. Held, as of 1972, there was a reasonable prospect of recovery from third parties; hence, no deductible loss was sustained during such year. Sec. 1.165-1(d)(2)(i), Income Tax Regs.
William A. Cromartie,John L. Conlon,Douglas L. Barnes, and Donna C. Rankin, for the petitioner. James F. Kidd and Scott R. Cox, for *22 the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income taxes, and the petitioner claimed an overpayment of tax, as follows: Year
Deficiency
Overpayment
1970
$172,492.76
$48,263.00
1971
204,827.88
0
1972
451,303.79
0
The issues remaining for decision are: (1) Whether the Commissioner erred in determining the estimated useful lives of the petitioner's buildings; (2) whether the turbine room and locker-washroom portions of the petitioner's power plant addition qualified for the investment credit under section 48(a)(1)(B)(i) of the Internal Revenue Code of 1954[1]; (3) whether, under section 50(a)(2), the petitioner was entitled to an investment credit for components of a paper machine delivered to it prior to August 15, 1971; (4) whether, under section 50(a)(1) or (2), the petitioner was entitled to an investment credit for the rebuilding of a Farrel roll grinder; (5) whether the Commissioner abused his discretion in classifying a freight elevator as a building component with a useful life of 20 years; (6) whether the Commissioner abused his discretion in disallowing part of the petitioner's additions *23 to its reserve for bad debts for 1970 and 1971; and (7) whether the petitioner was entitled to a casualty loss deduction for 1972 for the collapse of a portion of the roof of one of its buildings. FINDINGS OF FACT General
Some of the facts have been stipulated, and those facts are so found. The petitioner, Fort Howard Paper Company (Fort Howard), a Delaware corporation, had its principal office in Green Bay, Wis., at the time of filing its petition in this case. It filed its Federal corporate income tax returns for the taxable years 1970, 1971, and 1972 with the District Director of Internal Revenue, Milwaukee, Wis., by timely forwarding the returns to the Kansas City, Mo., Service Center. [2]
During the years at issue, Fort Howard was engaged in the manufacture and distribution of disposable paper products, including paper towels, industrial and automotive wipes, table napkins, and toilet and facial tissues. Most of its products were sold under its own brand names; the principal names on *24 household products were "Edon" and "Dolly Madison" for toilet tissues and "Mardi Gras" for printed towels and matching napkins. All such products were manufactured at Fort Howard's 160-acre papermaking and processing facility which was located on the Fox River in Green Bay, Wis. Fort Howard's main plant was bounded by the Fox River to the east, residential property to the south, industrial property and a boat slip to the north, and Broadway and State Streets to the west. However, certain outlying warehouses which were used for pulp and waste paper storage were located west of Broadway and State Streets. Fort Howard's products were sold nationwide in direct competition with those of 10 to 15 other manufacturers, some of which were significantly larger and had greater resources, than Fort Howard. Its primary competitors were American Can Co., Brown Co., Crown-Zellerbach, Kimberly-Clark, and Scott Paper Co. Although comprehensive industry statistics were not available, Fort Howard believed itself to be one of the larger suppliers of disposable paper products to the industrial, commercial, and institutional markets. The principal raw materials used by Fort Howard were: Waste paper *25 (which was recycled into pulp), market pulp, various chemicals, and coal (during the years at issue approximately 675 tons per day were utilized in its power plant).The basic manufacturing process for its products included the production of fiber from waste paper (a major process involving de-inking and removal of all compounds other than usable fiber), the feeding of pulp into papermaking machines which produced large rolls of paper, and the cutting, folding, printing, and packaging of the paper stock. During the years at issue, Fort Howard had eight papermaking machines which were generally in continuous operation except for repairs and adjustments. Issue 1. Useful Life of Petitioner's Plant
FINDINGS OF FACT As of 1970, Fort Howard's manufacturing facilities consisted of 2,470,000 square feet of interconnected office, production, and finished goods storage space and 470,000 square feet of raw material warehouse space. In addition, it owned various undeveloped properties in the Green Bay area, including a 285-acre site which was used for the disposal of solid waste. During the years at issue, its production facilities included: a 41,000 kilowatt coalfired generating plant which *26 produced all of its power and steam requirements, and which by the end of 1971 had been increased to 70,000 kilowatts; equipment for processing waste paper and market pulp into paper machine feed stock; eight Fourdrinier type papermaking machines and related drying equipment; and equipment for cutting, folding, printing, and packaging the paper stock. Fort Howard began its operations in 1920 with a single building. Over the years, additional buildings were built or acquired, so that at the end of 1972, it had 67 buildings. Most of the expansion involved the addition of new buildings to existing buildings so that a major part of its facility consisted of 42 interconnected buildings. The original building, erected in 1919, was designated by Fort Howard as its building No. 1. As additional buildings were acquired or constructed, they were assigned numbers substantially in chronological order. As a result of the manner of expansion, building No. 1 was surrounded by other buildings. Fort Howard's buildings were generally of masonry and steel construction, and all were well maintained. Its warehouses had reinforced concrete floors; the walls were either poured concrete, concrete *27 block, or pre-cast concrete; the roofs were a built-up type on a metal roof decking. The 14 outlying warehouses had a dry pipe sprinkler system. There were no windows or heat in the outlying warehouses. Lighting in the warehouses was provided by either fluorescent or incandescent light fixtures. Fort Howard's production buildings had reinforced concrete floors with a floor load rating ranging between 200 and 300 pounds per square foot. The walls were concrete block with a red face brick veneer, and the windows were primarily glass block. The production buildings had a wet pipe sprinkler system. Heat was provided in the production area by steam unit heaters with ventilation systems. The office area was located in the front of buildings Nos. 9, 49, and 60. This area was air conditioned and had perimeter heating. The offices had dropped ceilings, fluorescent lighting, and asphalt tile flooring. Fort Howard manufactured most of its paper products by recycling waste paper, such as newspapers, magazines, and telephone books. Waste paper was delivered to its plant by truck or railroad and was sorted as to grade. Depending upon operations at the time, the sorted waste paper was *28 then sent either to a processing area or to storage. Waste paper was stored either in four warehouse buildings adjacent to the receiving area or in ten outlying warehouses. It was transported to and from outlying warehouses by truck. The waste paper was treated chemically to remove ink and contaminants, such as dirt and glue, then beaten into a form of slush. The slush was screened to remove paper clips and other items, bleached, washed to remove any excess chemicals, and then pumped to storage tanks located near the various papermaking machines.
The waste paper stock was later mixed with certain amounts of virgin pulp, [3] which was stored either outdoors or in outlying warehouses. The mixed stock, which was about 99 percent water and 1 percent fiber, was then fed through an opening of thirty-thousandths of an inch into large papermaking machines, on which rolls of paper 6 feet in diameter and varying in width from 126 inches to 204 inches were formed. The stock was run across a rotating wire which retained the paper fiber and allowed the water to drain off. The fiber was then picked up from the wire by a rotating felt section and put through pressure rollers which formed the paper. *29 The paper was then run around a large rotating cast iron cylinder, from 12 to 16 feet in diameter, called a Yankee dryer, which was heated internally with steam at 100 pounds pressure in order to dry the paper. The paper was removed from the Yankee dryer by a metal blade and wound onto a large paper roll called a parent roll. The paper on the parent roll was then rewound onto smaller rolls, which were either stored or sent directly to be converted into the petitioner's products. Fort Howard's paper roll storage and converting operation were located in the basement and on the first and second floor levels of buildings adjoining those containing the papermaking machines. The paper rolls were transported to the converting area by means of lift trucks and between floors by elevator. After the paper was converted into a finished product, it was placed in shipping cartons and was then taken by a conveyor system either to the shipping department for immediate shipment or to storage for later shipment. Most of its finished products were shipped directly by rail from Green Bay. Finished products were *30 stored either within the central core of the plant or in one of the outlying buildings. From the early sixties through 1972, Fort Howard pursued a vigorous expansion policy. It added paper machines No. 7 in 1964 and No. 8 in 1968; each increased the company's papermaking capacity by approximately 15 percent. As of the end of 1970, Fort Howard had contracted for the addition of its ninth papermaking machine, which at that time was expected to expand its production of paper by 20 percent. As of the end of 1971, it was negotiating for the acquisition of an additional warehouse site in Green Bay to provide alternative rail shipping and receiving facilities. In 1972, it purchased a 4.2-acre tract of land near its main manufacturing site, to be used for the construction of a 91,400-square-foot warehouse and trans-shipment facility. In January 1973, construction commenced on a $1.2 million facility to provide additional indoor rail loading docks as well as additional space for trucks. On April 19, 1973, Fort Howard publicly announced that planning had begun for the addition in Green Bay of a tenth paper machine. Such expansion was subject to approval by various governmental agencies, *31 including the Wisconsin Department of Natural Resources (DNR). Such approval was not obtained, and in 1975, Fort Howard abandoned its plans for the addition of a tenth machine. A further expansion of the power generating plant, intended to increase its power margin, was under construction at the time of trial. As of 1970, Fort Howard had 2,470,000 square feet of interconnected office, production, and finished goods storage space, and 470,000 square feet of raw materials warehouse space. From 1971 through 1975, it expanded its plant as follows: Production &
Raw Material
Increase In
Finished Goods
Warehouse
Total Building End of
Storage Space
Space
Space Year
(Sq. Ft.)
(Sq. Ft.)
(Sq. Ft.)
1971
2,590,000
550,000
200,000
1972
2,799,760
550,369
210,129
1973
2,955,808
487,116
92,795
1974
2,961,254
507,116
25,446
1975
3,139,579
487,116
158,325
Total increase in building space
686,695
In order to assure itself of an uninterrupted supply of necessary raw materials and to mitigate the effects of price fluctuations, Fort Howard maintained large inventories of waste paper, market pulp, and coal. Such inventories were equal to current production requirements for the number of days in the years shown below: Number of Days Stockpiled *32 at December 31
Market Year
Wastepaper
Pulp
Coal
1970
115
470
590
1971
110
630
690
All of Fort Howard's paper machines were built or substantially rebuilt since 1962. The daily average production from its machines ranged as follows: Year
Tons Per Machine
1970 and 1971
50 to 125
1972
55 to 125
1973
55 to 140
1974
55 to 150
1975
55 to 170 Throughout the years at issue, Fort Howard maintained an engineering staff of 18 or 19 persons who were responsible for the continuous redesign and reconstruction of its paper machines and other equipment. Much of its equipment was built in its machine shop, which during the years at issue was staffed by approximately 75 machinists. The maintenance of such extensive machine shop facilities and personnel contributed greatly to Fort Howard's production efficiency.
In the 5 years ended December 31, 1975, Fort Howard made capital expenditures of $46,606,000 for buildings, machinery, and equipment, including waste treatment facilities, at its plant in Green Bay. This continuing mill modernization program enabled it to operate with increased efficiency to meet the growing demand for its products. As of the end of 1975, its papermaking machines were operated at full capacity *33 7 days a week. Its facilities for converting paper were generally operated on a three-shift, 5-day-a-week basis, and its capacity could have been expanded by working additional days or by adding additional converting equipment. In addition, Fort Howard enjoyed excellent relations with its employees. None of its employees were represented by a labor union, and it had never experienced a strike or work stoppage. The success of Fort Howard's operations was demonstrated by its net sales, which increased in each of the 18 years preceding the years at issue. Its net sales and net earnings from 1966 through 1975 were as follows: Year
Net Sales
Net Earnings
1966
$ 51,637,278
$ 5,567,369
1967
56,565,359
6,990,255
1968
64,213,266
7,704,435
1969
72,032,107
8,361,526
1970
80,356 ,874
9,301,879
1971
90,784,389
11,543,725
1972
103,186,276
12,896,818
1973
119,393,083
14,197,483
1974
156,601,054
20,107,921
1975
203,702,038
36,806,206 In 1972, Fort Howard completed the construction of its building No. 87, which was designed to house its No. 9 paper machine. The No. 9 paper machine demonstrated the technological developments that had occurred in papermaking machinery. It was one and one-half times as wide as Fort Howard's other *34 machines, was operated at a considerably faster speed, produced larger diameter rolls of paper, and was operated by the same number of personnel as each of its eight other machines. However, such modern machinery required higher and wider buildings than those in which the eight other machines were located, and because of the greater size and weight of the paper rolls produced, such modern machinery also needed floors with greater load ratings in the converting and storage areas than were available in some of Fort Howard's other buildings. Four of the larger, more modern paper machines could produce what Fort Howard produced with its nine machines. However, its older machines, all of which were built or rebuilt since 1962, were in no sense obsolete. By rebuilding, Fort Howard was able to update its equipment, staying abreast of modern technology. Machines such as those used by it would, with modernization, remain serviceable for more than 30 years. Fort Howard utilized substantial quantities of water in its operations. During the years at issue, its discharge of waste water was subject to limits imposed by the DNR. Approval of the DNR was required for any proposed expansion of *35 production at the Green Bay plant. In 1972, Fort Howard installed a secondary treatment system for treating water effluent at a cost of approximately $3 million. In the same year, it represented to the Securities and Exchange Commission and its stockholders that its new waste water treatment facilities would enable it to comply fully with pollution requirements then in effect without limiting its then present or foreseeable production capacity. As of the end of 1975, Fort Howard planned to construct a tertiary treatment facility at an estimated cost of $750,000. In 1970, Fort Howard began looking for a future mill site, and in 1972, it acquired an option to purchase a 200-acre parcel of land on the Arkansas River near Muskogee, Okla. In March of 1975, it purchased both the original 200-acre site and an additional continguous 200 acres. The Muskogee plant was not intended to replace the Green Bay facility, but rather to provide additional production capacity.As of the middle of 1976, Fort Howard had no plans to case doing business in Wisconsin. Final plans for the Muskogee plant were being developed at the time of the trial of this case. It was expected to produce 400 tons of *36 paper per day with 2 papermaking machines, or approximately half of the amount produced in the Green Bay plant in 1976. The estimated cost for construction of the new plant was $60 to $80 million. The Muskogee plant would utilize a straight-line flow concept of production, minimizing or eliminating the need to transport materials via trucks, lift trucks, and elevators. Fort Howard utilized the component method of depreciation for its buildings with five components, each having a separate useful life. [4] The useful lives utilized by Fort Howard, and the useful lives as determined by the Commissioner, were as follows: Fort Howard's
Commissioner's
Fort Howard's
Useful Lives
Determination Account Titles
(Years)
(Years)
Building shell
33
50
Sprinkler system
20
50
Heating
17
35
Plumbing
10
30
Lighting (non-
production
electrical
20
30
system) The component lives utilized by Fort Howard resulted in a composite life for its plant of 28 years; the Commissioner's determination resulted in a composite *37 life for the buildings of 43 years. The revenue agent who audited Fort Howard's income tax returns for the years at issue requested and received the assistance of a valuation engineer (IRS engineer) in his audit of its depreciation deductions. On October 11, 1973, the IRS engineer made an inspection of Fort Howard's facilities; such inspection revealed that its buildings were of substantial construction and well maintained. The IRS engineer recommended that the useful lives be extended to those subsequently determined by the Commissioner. The IRS engineer based his determination upon the following factors: (1) Many of Fort Howard's buildings and building components had been fully depreciated but were still in use; (2) the buildings had large, open floor areas which could be used for any purpose; (3) the plant site was ideal, and the buildings were substantially constructed; and (4) the guidelines of Rev. Proc. 62-21, 1962-2 C.B. 418, prescribed a composite life for factory buildings of 45 years and a composite life for warehouse buildings of 60 years. The engineering report further stated that: "The composite life for all the taxpayer's buildings should approach 50-55 years, *38 rather than [the] 43 years * * * recommended." As a result of his determination of the useful lives of Fort Howard's buildings, the Commissioner disallowed claimed depreciation deductions in the amounts of $328,844.37 for 1970, $336,692.13 for 1971, and $370,945.57 for 1972. OPINION We must first decide whether, as the petitioner contends, the Commissioner acted arbitrarily and unreasonably in determining the useful lives of its buildings. Generally, if the Commissioner determines that there is a deficiency in tax, the taxpayer has the burden of proving such determination to be incorrect. Welch v. Helvering,290 U.S. 111 (1933); Burnet v. Houston,283 U.S. 223 (1931); Rule 142, Tax Court Rules of Practice and Procedure. However, the petitioner contends that because the determination was arbitrary, the burden of proof shifted to the Commissioner. Helvering v. Taylor,293 U.S. 507 (1935); Suarez v. Commissioner,58 T.C. 792, 814 (1972). The basis of the petitioner's argument in this case is that the IRS engineer, who inspected the petitioner's plant and recommended that the useful lives of its buildings be extended, ignored certain allegedly undisputed factors which will render *39 its plant obsolete before the end of its physical usefulness. The petitioner contends that the IRS engineer based his recommendation solely upon his determination of the physical lives of the buildings, without any allowance for economic obsolescence. Having examined the IRS engineer's written report and heard his testimony at trial, [5] *41 we cannot accept the petitioner's contentions. In making his determination, the engineer had before him the facts that: (1) The petitioner had in use many buildings that had been fully depreciated on its books; (2) its buildings were extremely well constructed and well maintained; and (3) the petitioner was using a 28-year composite life for which it was unable or unwilling to offer any specific support. The engineer testified that although the petitioner's employees contended that there were certain "obsolescence factors" which should be considered, none of such employees ever revealed to him just what those factors were, and we found his testimony in this respect to be credible.Yet, the engineer did not base his recommendation solely upon his determination of the anticipated physical life of the plant, which was stated both in his report and at *40 trial to be 55 years; rather, he recommended a composite life of 43 years to grant the petitioner an allowance for whatever unnamed obsolescence factors might be present. Moreover, as discussed later in our opinion, the presence of any such factors is far from undisputed. Consequently, we reject the petitioner's argument that the deficiency determination was arbitrary and unreasonable and hold that the petitioner bears the burden of proving the Commissioner's determination of useful lives to be incorrect. Chaum v. Commissioner, 69 T.C.     (Oct. 31, 1977); Roberts v. Commissioner,62 T.C. 834, 836-837 (1974). [6] The substantive issue is whether the Commissioner erred in determining the useful lives of the petitioner's buildings and disallowing a portion of the depreciation deductions claimed by it for 1970, 1971, and 1972. The petitioner contends that the useful lives employed by it in computing its depreciation deductions were justified in light of the facts and circumstances existing during such years. It argues that the Commissioner based his determination solely on the physical state of the buildings, ignoring economic obsolescence. The petitioner argues only that the lives as determined by the Commissioner should be shortened to reflect obsolescence, and does not indicate whether, in its view, the Commissioner used physical lives that were too long. Section 167(a) allows a taxpayer to deduct a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business, including a reasonable allowance for obsolescence. The purpose of the deduction for depreciation is to permit the taxpayer to recover, over the useful life of the property, its cost or other basis. Real Estate-Land Title & Trust Co. v. United States,309 U.S. 13, 16 (1940); *42 Southeastern Building Corp. v. Commissioner,3 T.C. 381, 388 (1944), affd. 148 F. 2d 879 (5th Cir. 1945), cert. denied 326 U.S. 740 (1945). Useful life is defined in section 1.167(a)-1(b), Income Tax Regs., as "not necessarily the useful life inherent in the asset but * * * the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business." See also Massey Motors, Inc. v. United States,364 U.S. 92, 96 (1960). Such regulation further provides that useful life: shall be determined by reference to * * * [the taxpayer's] experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * [Sec. 1.167(a)-1(b), Income Tax Regs.] The regulations further provide with *43 respect to obsolescence that: The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. * * * [Sec. 1.167(a)-9, Income Tax Regs.; *44 emphasis supplied.) The useful life of property is a question of fact, to be determined on the basis of all of the facts and circumstances reasonably known or anticipated at the end of the year for which depreciation is taken. Casey v. Commissioner,38 T.C. 357, 381 (1962); Radio Station WBIR, Inc. v. Commissioner,31 T.C. 803, 817 (1959); Bullock v. Commissioner,26 T.C. 276, 281 (1956), affd. per curiam 253 F. 2d 715 (2d Cir. 1958). In order to sustain its burden with respect to an allowance for obsolescence, the petitioner must show with reasonable certainty that the buildings are becoming obsolete, and that they will be obsolete; that is, it must establish the normal life of the buildings, and that they will be obsolete before the end of that life. Dunn v. Commissioner,42 T.C. 490, 494 (1964); Bullock v. Commissioner,supra at 281; Detroit & Windsor Ferry Co. v. Woodworth,115 F. 2d 795, 797 (6th Cir. 1940), cert. denied 312 U.S. 692 (1941). At the least, the petitioner must show either a shift in the state of the papermaking industry which will render its plant inutile as a papermaking and converting facility ( Zimmerman v. Commissioner,67 T.C. 94, 107 (1976)), or a reasonably *45 prospective intended abandonment resulting from external forces ( American Valve Co. v. Commissioner,4 B.T.A. 1204, 1206 (1926)). The petitioner in this case has not established the normal life of its plant, but relies upon the proposition that certain obsolescence factors affecting the papermaking industry in general, and its plant in particular, justify using a 28-year composite life. Thus, we do not know the petitioner's position as to the physical life of its plant. The Commissioner's position is that the physical life of the buildings is in excess of 50 years but that, to give the petitioner an adequate allowance for any obsolescence that may be present, he has agreed to a useful life of 43 years for tax purposes.
At the trial, both parties presented the testimony of expert witnesses. The petitioner's expert was vice president of an appraisal company and was an engineer with many years experience as an industrial appraiser. He arrived at his opinion as to the useful lives for the petitioner's building shell account by determining the expired life of the buildings as of December 31, 1972, the future life of its plant as a paper mill, and the period of its further use thereafter *46 for some alternative purpose. He based his determination of the lives of the building service accounts on Bulletin F (IRS Pub. No. 173) because he lacked sufficient data to do otherwise. The lives determined by him were as follows: Useful Life Component
(Years)
Building shell
35
Sprinkler system
35
Heating system
20
Plumbing system
20
Electric lighting system
20 Based on these component lives, he determined a composite life for the plant of 32 years. The parties directed most of their argument to the useful life of the building shells, and we shall consider this aspect first. In this regard, the crux of the opinion of the petitioner's expert was his determination of the plant's remaining usefulness as a paper mill. In making such determination, he considered four factors: type of construction, building design, plant layout, and economic factors. In his report, he found the substantial construction of the petitioner's plant to be detrimental, in that it allegedly lacked the flexibility required for economical modernization and expansion programs. The building design and plant layout were considered inefficient, resulting in excess operating costs due to increased materials handling and *47 supervision. Finally, he considered the following economic factors affecting the useful life of the plant: lack of an adjacent plant site for expansion, environmental restrictions, and improved papermaking technology. Yet, of such factors, the excess operating costs was the only one considered in the formula he used to compute the remaining useful life of the petitioner's plant. The expert first advanced the proposition that industry moves when the annual costs of owning and operating an existing plant exceed the corresponding costs of a new plant. According to this proposition, the continuation of operations in the old plant is justified only if its higher operating costs are offset by a lower cost of ownership, that is, interest on investment, depreciation, and property taxes. He testified that as excess operating costs rise, the remaining useful life of the old plant diminishes. In his formula, the expert compared the costs of owning and operating the petitioner's present plant with the costs of owning and operating a substitute ideal property having the same productive capacity.Based on data submitted by the petitioner, he determined that there were annual excess operating *48 costs of $1,753,000 at its present plant. He estimated the cost of substitute property as $41 million. The interest rate and property tax rate were stated to be 10 percent and 3 percent, respectively. Using his formula, he determined that as of 1972, the remaining useful life of the plant as a paper mill was 17 years. The Commissioner also presented the testimony of an expert. His expert was an economist with a Ph.D. degree from the London School of Economics and Political Science, University of London; for 20 years, he had been a university professor and had taught business finance courses at both the undergraduate and graduate levels. In particular, he had taught courses involving the study of relocation feasibility, and had written several computer programs for use by students in determining relocation feasibility. This expert testified concerning the many factors to be considered in making a determination as to the economic feasibility of abandoning an existing facility and relocating. Several of the factors he described were not included in the analysis of the petitioner's expert. Moreover, he stated that the formula used by the petitioner's expert was not one with which *49 he was familiar and, in fact, was markedly different from techniques and formulas generally accepted and used in making this type of determination. However, on the basis of the facts of record, he was not able to make his own determination as to whether or when, in the petitioner's case, abandonment of its present plant and relocation would be economically justified or mandated. We found the testimony of the Commissioner's expert to be clear and persuasive. Moreover, he pointed out a major internal inconsistency in the formula used by the petitioner's expert. The petitioner's expert testified that as excess operating costs rise, remaining useful life diminishes; yet, in his formula, as excess operating costs rise, remaining useful life is extended. The petitioner attempted to explain the inconsistency, but we did not find its explanation satisfactory. Having heard the testimony of both experts, and having examined the report of the petitioner's expert, we have grave doubts as to the validity of the methods used by him and are compelled to reject his conclusions. The petitioner has attempted to portray itself as a company hobbled by an inefficient production system, inability *50 to keep abreast of technological developments, and environmental restrictions. We have made extensive findings of fact, and the facts simply do not support the petitioner's assertions. First, the petitioner's buildings were well constructed and well maintained, exhibiting no signs of deferred maintenance, and its past policy as to repairs, replacements, and renewals strongly supports the Commissioner. During the years at issue, the petitioner continued to use many buildings which had been fully depreciated on its books. In fact, its original building, constructed in 1919, was still in use in 1972.Thus, the petitioner's past experience does not support a building shell life of only 33 years. Sec. 1.167(a)-1(b), Income Tax Regs.; Coors Porcelain Co. v. Commissioner,52 T.C. 682, 696 (1969), affd. 429 F. 2d 1 (10th Cir. 1970).
At the trial, officers and employees of the petitioner testified that without capital improvements, its present plant would be obsolete within 15 or 20 years. However, as of the end of 1972, no decision had been made to abandon its present facility; in fact, as of the time of trial in 1976 no abandonment was planned or contemplated. Compare Radio Station WBIR, Inc. v. Commissioner,31 T.C. at 817, *51 with American Valve Co. v. Commissioner,4 B.T.A. at 1206. We found it significant that none of the petitioner's officers or employees was willing to testify that it would in fact abandon its Green Bay facility at any time in the foreseeable future. Moreover, the petitioner's actions during and subsequent to the years at issue are inconsistent with its argument herein. From 1970 through 1975, the petitioner expended $46,606,000 for capital improvements at its Green Bay plant, expanding its production and warehouse space by 686,695 square feet. As we stated in Dunn v. Commissioner,42 T.C. at 495: To permit an allowance for obsolescence while the property is being continuously used for its original purpose, while the petitioner continues to build new facilities and while no intention to discontinue such use appears, is to make an allowance in the face of conditions which are the very opposite of obsolescence. * * * See also Atlanta Biltmore Hotel Corp. v. Commissioner,349 F. 2d 677, 681 (5th Cir. 1965), affg. on this issue a Memorandum Opinion of this Court. The most that the petitioner has demonstrated is that it could, through failure to keep abreast of current technology, permit *52 its plant to become outdated. It has not demonstrated that this will in fact occur. In light of the petitioner's past actions, we cannot accept its contentions that its plant will be obsolete in 15 or 20 years.
The petitioner's witnesses claimed that its plant design was inefficient, resulting in increased handling of materials. In particular, they stated that transportation of raw materials from the outlying warehouses to its main plant created excess costs. Yet, the net sales of goods produced in that plant nearly quadrupled between 1966 and 1975, and the earnings from such production increased by an even greater margin--the 1975 net earnings were almost seven times those in 1966. Furthermore, the record reveals that the petitioner maintained additional warehouse space to enable it to stockpile raw materials, thus protecting itself against fluctuations in market price and supply shortages. The savings from such stockpiling may offset any alleged excess costs of transportation. The petitioner also asserted that its buildings were inadequate to house modern papermaking machinery, which is larger than some of its present machines. The fact is that all of the petitioner's machines *53 were built or rebuilt after 1962, and it was able to make changes in its plant to accommodate such modifications. On the record, we are not convinced that the plant design is as inefficient and unadaptable to modern papermaking technology as claimed by the petitioner. Finally, the petitioner alleged that environmental restrictions precluded expansion of the plant's productive capacity. However, as of the end of 1972, it represented to its shareholders that it would be able to comply fully with pollution requirements. Moreover, from 1970 through 1975, production expanded and earnings increased. What is more, even if environmental restrictions should prevent further expansion at some future time, there is absolutely no evidence to indicate that the plant would have to be abandoned merely because further expansion was prevented. Given the situation which existed as of the end of the years at issue, there is no basis for the petitioner's claim that environmental restrictions will force a shut-down of operations in 15 or 20 years. Sec. 1.167(a)-1(b), Income Tax Regs.; Casey v. Commissioner,38 T.C. at 381. We consider the evidence and arguments advanced by the petitioner in support *54 of its claim for an allowance for obsolescence to be too speculative to sustain its burden of proof. It is well to remember that the issue is merely when the petitioner may deduct the costs of its buildings. It wishes to accelerate such deductions because of its claim of anticipated obsolescence, but in our view, it has failed to prove that the circumstances on which it relies are sufficiently likely to occur to justify its claimed deductions.If, in fact, the Green Bay plant is abandoned earlier than anticipated because it becomes too expensive to operate such plant or because of environmental restrictions, the petitioner will then be entitled to accelerate its deductions for the costs of such facilities. American Valve Co. v. Commissioner, supra.Yet, based on the circumstances in the years at issue, the petitioner has failed to demonstrate that the building-shell life as determined by the Commissioner was erroneous; accordingly, the Commissioner's determination is sustained. Zimmerman v. Commissioner,67 T.C. at 104; Dunn v. Commissioner,42 T.C. at 494; Isenbergh v. Commissioner,31 T.C. 1046, 1047 (1959). With respect to the building services (that is, sprinkler system, heat, *55 plumbing, and lighting), the only evidence introduced by the petitioner was its expert's report. The expert relied upon the lives recommended in Bulletin F; however, Bulletin F was declared obsolete approximately 10 years prior to the years at issue. Rev. Proc. 62-21, 1962-2 C.B. 418, 430. Therefore, on the record before us, we must also sustain the Commissioner's determination of the useful lives of the building services. Zimmerman v. Commissioner,supra; Dunn v. Commissioner,supra; Isenbergh v. Commissioner,supra.
Issue 2. Investment Credit--Power Plant Addition
FINDINGS OF FACT In its petition, Fort Howard claimed that for 1970, it was entitled to an additional investment credit of $48,263 for the costs of constructing its power plant addition, and that it was entitled to a refund of taxes overpaid for such year. The power plant addition consisted of 2 adjacent structures located at the east end of the petitioner's mill as part of its power plant complex. The boiler room, which housed the boiler, was approximately 4 stories in height. The turbine room, which was located to the east and housed the turbines, was approximately 43 feet long and 2 stories in height. The boiler, *56 which operated at full capacity yearround, created steam at a pressure of 850 pounds. The steam was transferred to the turbines, which generated the electrical power used by the petitioner to operate its machines. Certain amounts of steam were extracted from the turbines at pressures of 35 and 100 pounds for use in the manufacturing process in the mill. During the winter months, some of the steam also was used to heat the mill. The turbine was an extremely heavy piece of equipment, half of which was located on the upper level of the turbine room and the other half of which extended through the floor to the lower level. The turbine was supported in its position by a very heavy concrete reinforced foundation, which itself rested upon pilings that were driven 40 feet into the ground. Most of the area on the lower level beneath the turbine was occupied by related equipment. Directly under the turbine was a condenser used to condense the steam from the turbine. There were also some oil pumps and auxiliary items associated with the turbine that were located in the same area. On the upper level, there was electrical equipment used with the turbine, including switch gear and a control *57 panel. Although the turbine room was designed and constructed for two turbines, only one had been installed during the year at issue. The second turbine was not installed until 1976. Until such time, some of the space reserved for it on the upper floor was used for the storage of parts needed in the operation of the entire power plant, and approximately 25 percent of the available space on the lower floor was used for welding operations, involving a table with several welding machines. It was more convenient to have the welding work which was needed for the power plant equipment performed in one of the power plant buildings rather than to have the equipment worked on elsewhere and transported through the mill. The power plant addition had concrete floors and was otherwise of similar construction to Fort Howard's other buildings.In the turbine room of the power plant addition, there were large double doors which worked on slides; thus, a turbine and generator could be moved into the turbine room, or removed therefrom, without tearing down the walls.
Also included in the boiler room portion of the power plant addition was a locker-washroom utilized only by power plant employees. *58 The locker-washroom facility was approximately 30 by 30 feet; it was situated on the third level of the boiler room, along the wall adjacent to the main power plant, and was used by maintenance personnel and power plant operators from both the main power plant and the addition. The facility could accommodate up to 35 employees and, in fact, was used by as many as 25 employees at one time to change clothes in the morning, as a place for lunch breaks, and as a shower room after work. OPINION We must decide whether an investment credit should be allowed for the turbine room and locker-washroom portions of the petitioner's power plant addition. [7] *59 More narrowly, the issue is whether such structures were "section 38 property" as defined by section 48(a)(1), which provides: (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction * * * [Emphasis supplied.] The Commissioner contends that the turbine room and locker-washroom facility were "buildings" and therefore not eligible for the investment credit. Alternatively, with respect to the turbine room, he claims that the portion designed for the second turbine does not qualify for the investment credit because it was not placed in service in 1970, as required by section 46(c)(1)(A). The petitioner contends that its power plant addition was not a building for investment credit purposes, but was other tangible property used as an integral part of its manufacturing operations. Pursuant to the authority vested in him by section 38(b), the Commissioner has issued regulations which define the term "building" as follows: (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually *60 covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, *61 coke ovens, brick kilns, and coal tipples. [Sec. 1.48-1, Income Tax Regs.] See also S. Rept. 92-437 (1971), 1972-1 C.B. 559, 575.The definition of the term "building" set forth in the regulations comports with ordinary understanding of the meaning of that term. However, it is clear that under the regulations certain structures, although they have the appearance of and are usually thought of as buildings, are not so classified for purposes of the investment credit. E.g., Brown-Forman Distillers Corp. v. United States,499 F. 2d 1263 (Ct. Cl. 1974) (structures for maturation of whiskey); Satrum v. Commissioner,62 T.C. 413 (1974) (sheet metal quonset structures housing chickens); Brown & Williamson Tobacco Corp. v. United States,369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F. 2d 1258 (6th Cir. 1974) (tobacco sheds); Rev. Rul. 72-223, 1972-1 C.B. 17 (hydroelectric power plant); Rev. Rul. 69-412, 1969-2 C.B. 2 (hydroelectric power plant); Rev. Rul. 68-132, 1968-1 C.B. 14 (potato processing chamber). In determining whether a structure was a building or other tangible property, the courts have generally applied a function or use test. Brown-Forman Distillers Corp. v. United States,supra at 1269-1271; *62 Satrum v. Commissioner,supra at 416; Central Citrus Co. v. Commissioner,58 T.C. 365, 371 (1972); Catron v. Commissioner,50 T.C. 306, 311 (1968). External appearances, that is, the fact that the structure looks like a building, have been ignored. Brown-Forman Distillers Corp. v. United States,supra at 1269-1271; Catron v. Commissioner,supra at 311; cf. Sunnyside Nurseries v. Commissioner,59 T.C. 113, 119 (1972). Instead, courts have focused upon whether the structure provides working space, other than as incidental to its primary function, and whether it is reasonably adaptable to some alternative use. Brown-Forman Distillers Corp. v. United States,supra at 1271; Satrum v. Commissioner,supra at 417; Sunnyside Nurseries v. Commissioner,supra at 119-121; Brown & Williamson Tobacco Corp. v. United States,supra at 1287-1288; see also S. Rept. 92-437, supra,1972-1 C.B. at 575.
Applying the functional test elucidated in the case law to the facts before us, it is clear that the function of the turbine room was to house the turbines and related equipment, and not to provide working space. The room was specifically designed for the turbines, with 40-foot pilings and special foundations, *63 and it was adjacent to the boiler room which contained the boilers that produced the steam to operate the turbines. The Commissioner has argued that the turbine room does not qualify for the investment credit because it might be used for some other purpose when the boiler and turbines are no longer used. Possible alternative uses suggested by the Commissioner included the provision of working or warehouse space. However, the test is whether the room could economically be used for other purposes, and although both parties made numerous assertions concerning this matter without furnishing supporting facts, it does appear that alternative uses of the room would not be practicable. Satrum v. Commissioner,62 T.C. at 416-417; Brown & Williamson Tobacco Corp. v. United States,369 F. Supp. at 1287-1288; see Rev. Rul. 72-223, supra,1972-1 C.B. at 18; Rev. Rul. 69-412, supra,1969-2 C.B. at 3. Its size was too small to be used economically for storage space, and its location was such as to make its use for working space uneconomical.Moreover, to use the room for other purposes might require the removal of the reinforced concrete foundations constructed for the support of the turbines. The *64 Commissioner also has argued that the turbine room does not qualify for the investment credit because it provided space for other activities, specifically welding and storage, during the year at issue. However, incidental human activities carried on in property used as an integral part of the manufacturing process does not cause the property to fail to qualify for the investment credit. Catron v. Commissioner,50 T.C. at 316. The Commissioner himself has ruled that the fact that "Small areas within the structures are partitioned off to provide washrooms, a control room, shops, and other necessary personnel areas" does not disqualify a hydroelectric power plant for investment credit purposes. Rev. Rul. 69-412, supra,1969-2 C.B. at 2. The petitioner's temporary use of the space for the welding activities and the storage of parts is analogous to such incidental activities. Although the turbine room could not economically be used for other purposes over the long run, the space designed for and ultimately occupied by the second turbine was available for other use until that turbine was acquired and installed, and the petitioner naturally decided to make some use of the space. The welding *65 activities took place in such area on the first floor, and the parts were stored in such area on the second floor. Such temporary use does not alter the fact that the primary purpose for the space was to house the turbine and related equipment, and in our judgment, such temporary use does not disqualify the property. Having found that the turbine room portion of the petitioner's power plant addition qualifies as section 38 property, we must consider the Commissioner's alternative argument that the portion of the turbine room reserved for the second turbine was not "placed in service" during 1970 as required by section 46(c)(1)(A).With respect to such requirement, the regulations provide: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years: (i) the taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) the taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the *66 production of income, in a tax exempt activity, or in a personal activity. [Sec. 1.46-3(d)(1) (in part), Income Tax Regs.] Thus, it is possible for property to be placed in service for purposes of the investment credit prior to the period for which depreciation is allowable, but in no case is it considered to be placed in service later than the first year for which depreciation is allowable. The fact that the second turbine itself was not installed until 1976 is not determinative; rather, we must determine when the structure housing the turbines was placed in service. As of 1970, the turbine room was ready and available for the second turbine. Accordingly, we hold that the turbine room was placed in service during such year. Cf. Noell v. Commissioner,66 T.C. 718, 729 (1976). We must also decide whether the locker-washroom portion of the boiler room constitutes section 38 property. We agree with the Commissioner that such facility cannot, as the petitioner contends, be characterized as an "incidental toilet" (compare Rev. Rul. 69-412, 1969-2 C.B. at 2), or as an integral part of the boiler room operations. The locker-washroom was used by up to 25 employees at one time as a place *67 for lunch breaks and to shower and change clothes before and after work. Moreover, it was used not only by boiler room employees, but by employees from the entire power plant complex. It is clear that if the facility were detached and removed a few feet from the power plant addition, it would be a "building," and the fact that it was located within the boiler room does not change its character. Cf. Central Citrus Co. v. Commissioner,58 T.C. at 371; Catron v. Commissioner,50 T.C. at 313-314. We hold that the locker-washroom is not section 38 property, and therefore does not qualify for the investment credit. An allocation may be made of the cost of the qualifying and nonqualifying portions of the boiler room, and an investment credit for the qualifying portion should be allowed in computing the decision in this case. Catron v. Commissioner,supra.
Issue 3. Investment Credit - No. 9 Paper Machine
FINDINGS OF FACT On August 11, 1970, the petitioner entered into a written contract with the Paper Machinery Division of the Beloit Corporation (Beloit), whereby Beloit agreed to furnish to the petitioner "One (1) 204" [inch] Dry Crepe Tissue Machine" (the No. 9 paper machine) for $2,450,000. *68 The petitioner ultimately paid $2,632,443 under the contract. Such contract provided in relevant part: TERMS OF PAYMENT: Ten percent (10%) with placement of order. Six (6) equal bi-monthly payments of twelve and onehalf percent (12-1/2%) beginning two (2) months after receipt of order. Fifteen percent (15%) sixty (60) days after final shipment. * * *
SHIPMENT : * * * Delivery to be made to carrier for Purchaser's account, f.o.b. cars or trucks, works of Builder at Beloit, Wisconsin, and other shipping points, at which time and place, the title and possession of shipment will transfer to Purchaser. * * * * * *
WARRANTY: All parts of the machinery are guaranteed against defects of workmanship and material for a period of twenty-four (24) months from date of complete shipment, but in no event to exceed one (1) year from date of start-up, whichever comes first. Any part having defects in material or workmanship within this period will be replaced by Builder free of charge, f.o.b. cars shipping points. All transportation and installation expense to be borne by Purchaser. START-UP SERVICE : Builder will provide the service of start-up personnel to function as technical consultants *69 in the pre-startup instruction, checkout and adjustment of Beloit equipment and controls, during the start-up of The Equipment and possible subsequent tune-up. This service will be provided by Builder without charge for the equivalent of a period not exceeding fourteen (14) days total on the paper machine equipment and ten (10) days on the unwind equipment. Any time in excess of this, if requested by the Purchaser, will be charged at Builder's regular rate. * * *
NOTE: There are no understandings or agreements not included in this Contract. * * * [Emphasis supplied.] Beloit proceeded with the manufacture of the No. 9 paper machine in a manner consistent with its regular business practice. Delivery of parts began in March 1971, and continued until the machine was placed in operation in December 1972. As of July 31, 1971, parts and components costing $1,428,615 had been completed and shipped. Erection of the No. 9 paper machine began in May 1972 and was completed in December 1972.A centri screen for use in connection with the No. 9 paper machine was delivered and installed prior to August 15, 1971. [8] *70 The cost for such work and equipment was $41,765.96. The No. 9 paper machine was a massive piece of equipment which had to be shipped to the petitioner's mill in parts. The portion of the machine manufactured by Beloit occupied four levels of the petitioner's building No. 87, which was specifically constructed for it. The August 11, 1970 contract made no provision for Beloit to supply an erector to supervise the assembly of the No. 9 paper machine. However, on April 5, 1972, the petitioner issued a purchase order to Beloit: "To cover the expenses of an erector from the Beloit Corporation to assist in the erection of our #9 Paper Machine." The erector from Beloit worked a 40-hour week for 6 months in supervising the installation of the No. 9 paper machine. The petitioner also entered into a contract with the Oscar J. Boldt Construction Company of Appleton, Wis., for certain labor, equipment, and materials to be supplied for the erection of the No. 9 paper machine. In addition, 40 to 45 Fort Howard personnel worked on the installation. Proper assembly of the No. 9 paper machine required the services of an erector, and as a practical matter, the erector *71 had to come from Beloit, since only a Beloit employee was familiar with the manufacturer's drawings and parts numbering system. In addition, the erector from Beloit could and did act as Beloit's representative in approving back charges to the manufacturer for modifications or corrections made during the course of the installation. It was a longstanding custom in the papermaking machinery industry for the manufacturer of a papermaking machine to supply an erector to supervise its installation. Also by custom and practice, the erector's services were not provided for in the original contract for the machine, but were the subject of a separate contract executed when the purchaser was ready to assemble and install the machine. Such custom resulted from the fact that the number of erectors needed depended upon the number of shifts to be worked during the installation and upon the duration of the assignment, and such information was not available at the time the contract for the machine was signed. Also, the charge for the erector was based upon the direct labor rates in effect at the time of the installation, and such rate was not known at the time the original contract was signed. On *72 its 1972 Federal income tax return, the petitioner claimed an investment credit based upon the total cost of the No. 9 paper machine.The Commissioner disallowed $100,003, the portion of such credit attributable to parts completed by Beloit and shipped to the petitioner prior to August 15, 1971. On its 1972 return, the petitioner also claimed an investment credit of $2,924 based on the cost of the centri screen, and such credit was disallowed in its entirety. OPINION We must decide whether the petitioner is entitled to an investment credit under section 38 for those parts of its No. 9 paper machine which had been completed by Beloit and delivered to the petitioner's plant prior to August 15, 1971. It is recognized that the No. 9 paper machine is section 38 property within the meaning of section 48(a), but the Commissioner argues that the components manufactured and delivered before August 15, 1971, are not eligible for the credit because of the provisions of sections 49(a) and 50(a)(2). The investment credit was "turned off" by section 49(a), which provides, in relevant part, "For purposes of this subpart, the term 'section 38 property' does not include property * * * which is acquired *73 by the taxpayer after April 18, 1969"; but the credit was "turned on" again by section 50(a), which provides, in relevant part: (a) General Rule.--Section 49(a) (relating to termination of credit) shall not apply to property-- * * *
(2) which is acquired by the taxpayer-- (A) after August 15, 1971, or (B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971. As the contract with Beloit was entered into prior to March 31, 1971, the petitioner must demonstrate that the property was acquired after August 15, 1971. [9]Sec. 50(a)(2)(A). The regulations provide that "Property shall be deemed to be acquired when *74 reduced to physical possession, or control." Sec. 1.48-2(b)(6), Income Tax Regs. The petitioner argues, citing Madison Newspapers, Inc. v. Commissioner,47 T.C. 630 (1967), that it purchased an installed paper machine, not components thereof, and therefore, it did not acquire the property until the machine had been installed and was operational. However, the facts in this case do not support the petitioner's position. In Madison Newspapers, the taxpayer contracted to purchase an eight-unit printing press, three units of which were delivered to the taxpayer's premises before the end of 1961 but were not installed by the seller until January 1962. The Court held that the test of possession in the regulations cannot be applied until we first ascertain what was sold and to be acquired. Thus, physical possession of the uninstalled units was not determinative; the Court concluded that the taxpayer had purchased three installed units of a printing press and that these were the property with respect to which time of acquisition should be measured. Such conclusion was based upon the finding that the seller was primarily responsible for the erection and installation of the units: The underlying *75 essential fact is that petitioner contracted for and * * * [the seller] agreed to furnish three installed units of a printing press and not an uninstalled assortment of components thereof. This is the clear import of the provision in the agreement that * * * [the seller] was to furnish installation personnel, albeit at petitioner's expense, and that the three units were to be tested after notification to petitioner by * * * [the seller] that they were "ready for commercial operation and acceptance." [47 T.C. at 637; emphasis in original.] Moreover, under the terms of the contract, title to the presses remained in the seller until the full purchase price had been paid, and the taxpayer was required to insure the units for the seller's benefit. In addition, the seller warranted that the machine would be built according to specifications. 47 T.C. at 631-632. Under all the facts, the Court concluded that the seller retained possession and control of the machine until such time as the machine was tested, started up, and turned over to the buyer, at which time, pursuant to the contract, the buyer was expected to accept it. 47 T.C. at 637. The time of acquisition of machinery was the *76 issue in J. E. Barron Plastics, Inc. v. Commissioner,47 T.C. 638 (1967), affd. per curiam 397 F. 2d 250 (6th Cir. 1968), decided on the same day as Madison Newspapers. In J. E. Barron Plastics, the Court examined the terms of the contract and concluded that the taxpayer had not purchased an installed machine. In concluding that the taxpayer had acquired the macine as soon as it was delivered, the Court stated: It is significant that * * * [the seller] assumed no responsibility for installation, beyond furnishing an erection supervisor for a limited period of time solely for the purposes of "checking final erection, instructing operators and starting the Equipment"; that its warranty was confined to defects in material and workmanship with respect to equipment of its own manufacture; and that the agreement between petitioner and * * * [the seller] expressly provided that "Equipment shall be installed by and at the expense of the Purchaser" and contained no provision for acceptance by petitioner after testing. Thus the situation herein is unlike that which obtained in Madison Newspapers,Inc.,supra. [47 T.C. at 641; emphasis in original.] In the case before us, Beloit assumed no contractual *77 responsibility for installation of the machine. However, the petitioner argues that the contract should be read in the light of custom and practice in the paper machine manufacturing industry, and urges that by such practice, Beloit was obligated, at the time of the original contract, to provide the services of an erector to supervise installation of the machine. Yet, even if we accept such contentions, we cannot find that the petitioner purchased an installed machine. The seller merely undertook to provide supervisory personnel; it did not assume primary responsibility for the installation of the machine. In Madison Newspapers, there was also a contractual provision providing for diagnostic testing, the successful completion of which was a condition precedent to acceptance by the buyer. See also LTV Corp. v. Commissioner,63 T.C. 39 (1974). In the case before us, Beloit agreed only to provide the services of start-up personnel to function as technical consultants. Its warranty extended only to parts, and only until the earlier of 24 months after complete shipment or 1 year after start-up. Thus, it was conceivable that Beloit's warranty could have expired before the machine had *78 been completely installed and was operational. Compare Madison Newspapers, Inc. v. Commissioner,47 T.C. at 635-636. Moreover, the contract expressly provided that title and possession passed to the petitioner upon shipment of the parts, and further provided that there were no understandings or agreements not incorporated into the contract. A taxpayer's right to claim the investment credit during the years at issue was fortuitous. At the time the petitioner entered into the contract to purchase the No. 9 paper machine, the investment credit had been turned off so that the petitioner had no reason to expect that it would receive any credit in connection with the acquisition of such machine. Even though it had no such expectation, Congress subsequently decided to allow it a credit for property acquired after August 15, 1971. Thus, the date of acquisition became critical, and property acquired just after August 15, 1971, qualified, although property acquired just before such date generally did not qualify. In applying the rules of section 50(a)(2) to the facts of this case, we must decide what the petitioner acquired and when it was acquired. To be entitled to the credit, the petitioner *79 has the burden of proving that it acquired qualifying property after the critical date. In this case, it has failed to carry such burden. Although the contract stated that Beloit was selling and the petitioner was purchasing one No. 9 paper machine, the seller was merely obligated to deliver components of such machine; it had no responsibility for assembling such components into a machine. The petitioner would have us put a gloss on the contract to the effect that Beloit was obligated to provide an operating paper machine; yet, we assume that a contract of this magnitude was carefully written by the parties, and there is simply no basis for reading into such contract any such obligation on the part of the seller. Accordingly, we hold that when the parts were delivered to the petitioner, Beloit's obligation was fulfilled, that the petitioner acquired such parts at such time, and that it is not entitled to any investment credit for those parts acquired before August 15, 1971, including the centri screen. Compare LTV Corp. v. Commissioner,supra, and Madison Newspapers,Inc. v. Commissioner,supra, with J. E. Barron Plastics,Inc. v. Commissioner,supra.
Issue 4. Investment Credit *80 - Rebuilding of Farrel Roll Grinder
FINDINGS OF FACT In January of 1971, the petitioner issued a purchase order with respect to its Job No. 754, the rebuilding of a Farrel roll grinder to accommodate the larger size paper rolls used in the No. 9 paper machine. The roll grinder was shipped to the Farrel Company for rebuilding on May 5, 1971, and the invoice for the work was dated June 18, 1971. The entire cost of Job No. 754 was $90,604.66, all of which was paid prior to August 15, 1971. The petitioner in its 1971 Federal income tax return claimed an investment credit for the rebuilding of the Farrel roll grinder. In his notice of deficiency, the Commissioner disallowed such credit, on the grounds that the property was not eligible for the investment credit because the purchase order was dated January 8, 1971, and the job was completed by July 31, 1971. OPINION To decide this issue, we must again interpret section 50 which restored the investment credit. Section 50(a) provides: (a) General Rule.--Section 49(a) (relating to termination of credit) shall not apply to property-- (1) the construction, reconstruction, or erection of which-- (A) is completed by the taxpayer after August *81 15, 1971, or (B) is begun by the taxpayer after March 31, 1971, or (2) which is acquired by the taxpayer--
(A) after August 15, 1971, or (B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971. [Emphasis supplied.] The Commissioner argues that since the petitioner did not perform any part of the reconstruction of the Farrel roll grinder itself, it is acquired property within the meaning of section 50, and that since it was acquired prior to August 16, 1971, it is not eligible for the investment credit unless the petitioner establishes that it was acquired pursuant to an order placed after March 31, 1971. Since the petitioner has made no argument with respect to the rebuilding of the roll grinder in its brief, its position is unclear. The petitioner apparently relies upon the fact that reconstruction commenced subsequent to March 31, 1971, to sustain its entitlement to the credit. In resoring the investment credit, Congress made the credit generally available for property constructed or acquired after August 15, 1971. However, the credit was extended to property ordered on and after April 1, 1971: to *82 avoid discrimination against those who took action on or after that date to acquire eligible assets on the basis of assurances as to the availability of the credit made by the Secretary of the Treasury, after consultation with the ranking members of the Congressional taxwriting committees. * * * [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 500.] See also S. Rept. 92-437 (1971), 1972-1 C.B. 559, 563. In the case of acquired property, Congress contemplated that the credit would be available only if the taxpayer could clearly establish that such property was acquired pursuant to an order placed after March 31, 1971. H. Rept. 92-533, supra,1972-1 C.B. at 504; S. Rept. 92-437, supra,1972-1 C.B. at 570. The petitioner has not shown that it rebuilt the roll grinder itself, or that it exerted such control over the rebuilding as to cause the work to be treated as performed by it; accordingly, the rebuilding of the roll grinder must be treated as acquired property for purposes of section 50. Sec. 1.48-2(b), Income Tax Regs.; cf. Public Service Co. of New Mexico v. United States,431 F. 2d 980 (10th Cir. 1970); Lykes Bros. Steamship Co. v. United States,513 F. 2d 1342 (Ct. Cl. 1975); Pacific Far East Line, Inc. v. United States,513 F. 2d 1355 (Ct. Cl. 1975). *83 The record establishes that the property was acquired before August 16, 1971; therefore, the petitioner must establish that the acquisition was pursuant to an order placed after March 31, 1971, in order to prevail. Sec. 50(a)(2)(B). In light of the congressional purpose in enacting section 50(a)(2)(B), the fact that the physical work was commenced after March 31, 1971, is not sufficient to entitle the petitioner to the credit. It is undisputed that the rebuilding of the roll grinder was undertaken pursuant to an order placed prior to such date; therefore, the property is not eligible for the investment credit. Issue 5. Depreciation - Building No. 77 Freight Elevator
FINDINGS OF FACT In 1972, the petitioner completed the installation of a freight elevator in its building No. 77. The elevator was used primarily to carry the large paper rolls produced on the petitioner's No. 9 paper machine to storage areas located on the various floors of building No. 77 and was the only elevator in the petitioner's mill which was capable of handling such large rolls. In its 1972 Federal income tax return, the petitioner treated the building No. 77 elevator as a machine used in its business and *84 assigned to it an ADR machine life of 9-1/2 years, on the basis of which it claimed $10,338.16 as depreciation on the elvator for 1972. The Commissioner classified the elevator as a building component with a 20-year useful life. OPINION Section 167(m) permits a taxpayer to elect to base its depreciation deductions on the class life ADR system. Such section also authorizes the Commissioner to prescribe class lives for property, on an industry-by-industry or other basis. Pursuant to such authority, the Commissioner, in 1972, promulgated Rev. Proc. 72-10, 1972-1 C.B. 721, which sets forth asset guideline classes and guideline lives. See sec. 1.167(a)-11(b)(4)(ii), Income Tax Regs.
Assets used in the manufacture of paper and related products are included in guideline class 26; in Rev. Proc. 72-10, the description of assets within this class was as follows: [10] *86 26.1 Manufacture of pulps from wood and other cellulose fibers and rags: Includes assets used in the manufacture of paper and paperboard, but does not include the assets used in pulpwood logging nor the manufacture of hardboard 26.2 Manufacture of paper and paperboard: Includes assets used in the production of converted products *85 such as paper coated off the paper machines, paper bags, paper boxes, and envelopes [Rev. Proc. 72-10, supra at 725.] The petitioner has taken the position that its elevator is converting machinery within the meaning of guideline class 26.2, and hence is depreciable over a period of 9-1/2 years, the lower limit prescribed for such machinery for 1972. It argues that the elevator was constructed to handle the larger paper rolls produced by the No. 9 paper machine and that therefore the elevator should be classified in the same manner as would be a crane or other equipment associated with the operation of that machine. The Commissioner's position is that elevators are included within asset guideline class 65.0, which in relevant part provides: Building Services: Provision of the services of buildings, whether for use by others or for taxpayer's own account. Assets in the classes listed below include * * * equipment for the movement of passengers and freight within the building; * * * Structures, closely related to the equipment they house, which are section 38 property are not included. See section 1.48-1(e)(1) of the regulations. Such structures are *87 included in asset guideline classes appropriate to the equipment to which they are related. * * * [Rev. Proc. 72-10, supra at 730; emphasis supplied; footnote omitted.] The petitioner has not explicitly challenged the validity of Rev. Proc. 72-10. In any event, in view of the delegation of authority to the Commissioner to prescribe guideline classes and guideline lives, the revenue procedure must be upheld unless he acted arbitrarily, and the petitioner has presented no grounds for finding that the revenue procedure is arbitrary. Cf. Brittingham v. Commissioner,66 T.C. 373, 395 (1976), on appeal (5th Cir., Dec. 1976) (allocation of income among related corporations); Massachusetts Business Development Corp. v. Commissioner,52 T.C. 946, 951 (1969) (bad debt reserves). The decision, thus, turns on an interpretation of the provisions of the revenue procedure. In general, it provides that elevators are to be treated as building components, and that position is in accordance with the traditional treatment of elevators. Sec. 1.48-1(e)(2), Income Tax Regs.; Rev. Rul. 65-230, 1965-2 C.B. 75; Rev. Proc. 62-21, 1962-2 C.B. 418. The petitioner has failed to convince us that its elevator *88 comes within the exception of guideline class 65.0 that "Structures, closely related to the equipment they house, which are section 38 property are not included. See section 1.48-1(e)(1) of the regulations." Although section 48(a)(1)(C) explicitly makes elevators section 38 property, it appears that such provision was enacted merely to make elevators eligible for the investment credit and that it was not intended to affect the character of such property for depreciation purposes. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964-1 (Part 2) C.B. 125, 159. Since the revenue procedure speaks of "Structures, closely related to the equipment they house" and since it refers to section 1.48-1(e)(1) of the regulations which provides that certain structures are not to be treated as buildings, it appears that such reference was not intended to include elevators generally. Moreover, the only evidence furnished in support of the petitioner's position was that the elevator was used primarily to handle the large paper rolls produced by the No. 9 paper machine. We do not know what else the elevator may presently be used for, and we have no evidence as to what alternative uses could be made of *89 the elevator, when and if the No. 9 paper machine should no longer be operated. In view of this dearth of evidence, we cannot conclude that the elevator was so closely related to the operation of the No. 9 paper machine that it "clearly can be expected to be replaced" when such machine is replaced (sec. 1.48-1(e)(1), Income Tax Regs.), and accordingly, we must sustain the Commissioner's determination. Issue 6. Additions to the Reserve for Bad Debts
FINDINGS OF FACT The petitioner used the reserve method of accounting for computing its bad debt deduction. For the years 1966 through 1972, its accounts receivable and the net amount of debts determined by it to be worthless were as follows: [11] *90 Year Ended
Debts Actually Dec. 31
Accounts Receivable
Written Off
1966
$4,050,518
$27,709
1967
4,430,825
5,952
1968
4,867,948
4,847
1969
6,012,246
20,308
1970
5,695,809
27,168
1971
6,711,838
80,676 a
1972
8,472,456
23,283 As of December 31, 1969, the reserve for bad debts had a balance of $120,000. [12] *91 In 1970 and 1971, the petitioner adjusted its reserve as follows: Year Ended
Year Ended
Dec. 31, 1970
Dec. 31, 1971
Initial reserve level
$120,000.00
$140,000.00
Charges against reserve
27,168.09
80,676.15
Additions to reserve
47,168.09
100,676.15
Final reserve level
140,000.00
160,000.00 The petitioner made the additions to its bad debt reserve because of successive increases of approximately $10 million in its net sales for 1970 and 1971. In his notice of deficiency, the Commissioner determined, based on prior years' experience, that a reserve for bad debts of $120,000 was adequate for the years 1970 and 1971; therefore, for each of the years 1970 and 1971, he disallowed a deduction for an addition of $20,000 to the reserve in excess of actual bad debts written off. OPINION Section 166(c) permits a taxpayer to deduct "a reasonable addition to a reserve for bad debts" in lieu of deducting specific debts as they become worthless. Regulations promulgated pursuant to such section provide that: What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those *92 arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. [Sec. 1.166-4(b)(1), Income Tax Regs.] See also Black Motor Co. v. Commissioner,41 B.T.A. 300, 304 (1940), affd. 125 F. 2d 977 (6th Cir. 1942). The reserve is an approximation of the loss a taxpayer can reasonably expect to sustain on obligations owing to it at the end of the taxable year. Westchester Development Co. v. Commissioner,63 T.C. 198, 210 (1974). Thus, the reasonableness of an addition to the reserve account turns upon the adequacy of the existing reserve. If the existing reserve balance is adequate to offset the bad debts reasonably to be anticipated from outstanding accounts receivable, any addition to the reserve will not be reasonable and accordingly will not be deductible. Westchester Development Co. v. Commissioner,supra at 211; James A. Messer Co. v. Commissioner,57 T.C. 848, 864 (1972). Section 166(c) expressly grants the Commissioner discretion to determine the reasonableness of a taxpayer's additions to its bad debt reserves. Thus, it is not sufficient for the petitioner to show that the claimed additions were reasonable or consistent with *93 sound business judgment. Rather, to prevail, the petitioner must demonstrate that the Commissioner abused his discretion in disallowing the claimed additions. Maverick-Clarke Litho Co. v. Commissioner,180 F. 2d 587, 592 (5th Cir. 1950), affg. 11 T.C. 1087 (1948); James A. Messer Co. v. Commissioner,supra at 864. The petitioner's position is that it should be allowed to increase the balance in its reserve for bad debts to $140,000 for 1970 and to $160,000 for 1971, because it enjoyed increases in its net sales and accounts receivable during those years. However, the petitioner has failed to demonstrate that its existing reserve balance was not adequate to offset losses reasonably to be anticipated from such increased sales. Indeed, in the past, its reserve for bad debts has substantially exceeded actual losses sustained. Thus, the petitioner has completely failed to show that a reserve of $120,000, as permitted by the Commissioner for 1970 and 1971, was not sufficient to offset anticipated losses; accordingly, we hold that the petitioner has failed to prove that the Commissioner abused his discretion in disallowing deductions for additions to the reserve for 1970 and 1971 to *94 the extent that the additions exceeded bad debts actually written off during such years. James A. Messer Co. v. Commissioner,supra at 866. Issue 7. Casualty Loss
FINDINGS OF FACT On January 3, 1972, part of the roof of Fort Howard's building No. 87, which was then under construction, collapsed. The portion which collapsed consisted of two steel box beams (beams Nos. 8 and 9), together with the adjacent box purlins and concrete roof deck. Beams Nos. 8 and 9 were two out of fourteen box beams which were then in place and connected by smaller steel structures called purlins. Beams Nos. 8 and 9 collapsed at approximately the center of the building and fell onto the cement slab beneath, taking with them the connecting purlins. Although none of the other beams collapsed, the entire roof was dismantled and rebuilt. Subsequent to the collapse, Fort Howard engaged the services of a consulting engineering firm to determine the cause of the occurrence. In a final written report, the consulting firm determined that the collapse of beams Nos. 8 and 9 had been caused by fractures in the structural steel of which the beams were constructed. Although a complete fracture occurred only in *95 beams Nos. 8 and 9, cracks were discovered in beams Nos. 4, 7, 10, 12, and 13 after they were removed from the roof. The workmanship on all of the beams was determined to have been negligent, particularly the welds which were not made in accordance with sound engineering practices or proper weld design and were not in compliance with applicable building codes. The steel used was found to be in substantial conformance with the specifications, but was determined to be, in some respects, of borderline quality. Low temperatures (between 7 and 11 degrees Farenheit) apparently precipitated the collapse. After the collapse, Fort Howard filed a proof of claim with its property damage insurer, Affiliated F.M. Insurance Company (Affiliated), seeking reimbursement in the amount of $230,055.50. Fort Howard claimed reimbursement for the cost of replacing all of the structural steel members comprising the roof support structure; the cost of material and labor used to repair the damage caused by the collapse of beams Nos. 8 and 9; the cost of certain testing and storage of the beams; and the costs incurred in employing the consulting engineering firm to investigate the cause of the occurrence *96 and to redesign the structure, incorporating a different design. Affiliated admitted liability in the amount of approximately $43,000 for damages caused by beams Nos. 8 and 9 when they collapsed, and paid such amount to Fort Howard. However, it denied the remainder of Fort Howard's claim, relying primarily upon a policy provision which excluded from coverage the costs of making good any faulty workmanship, material, construction, or design. Affiliated's own investigation, initiated immediately after the collapse, indicated that the steel beams constituting the support structure for the roof were faulty in workmanship, material, and design. At a meeting in November or December of 1972, counsel for Affiliated advised counsel for Fort Howard that in his opinion, prospects were very good that from responsible third parties, Affiliated could recover amounts paid Fort Howard and Fort Howard could recover the remainder of its claim. Affiliated offered to extend indefinitely the time period for filing suit against it under the policy, pending resolution of litigation against responsible third parties. However, such offer was rejected by Fort Howard, which thereafter filed a lawsuit against *97 Affiliated, as well as a separate action against the general contractor, certain subcontractors, and certain suppliers of materials (the contractors), to recover for damages arising from the collapse. Affiliated and the contractors all denied liability. A portion of the litigation among Fort Howard, Affiliated, and the contractors was settled in September 1975. As a result of such settlement, Fort Howard received $281,000 by April 1976. It paid $32,130 to Affiliated pursuant to an agreement entered into as part of the settlement. On its 1972 Federal income tax return, Fort Howard deducted a casualty loss of $177,704.43, computed as follows: Total loss
$220,704.43
Less insurance
proceeds
43,000.00
Net loss
$177,704.43
In his notice of deficiency, the Commissioner denied such deduction on the grounds that no loss in excess of insurance reimbursement was incurred, or in the alternative, if any loss was incurred, there existed a reasonable prospect of recovery in the suits then pending so that any allowable loss would be deductible in the year the litigation was resolved. OPINION Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by *98 insurance or otherwise." To be deductible, a loss must be evidenced by closed and completed transactions and fixed by identifiable events. Sec. 1.165-1(b), Income Tax Regs.; Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F. 2d 786 (4th Cir. 1975); Gale v. Commissioner,41 T.C. 269, 272 (1963); Allied Furriers Corp. v. Commissioner,24 B.T.A. 457, 458 (1931). In particular, section 1.165-1(d)(2)(i) of such regulations provides: (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. * * * In cases involving claims for reimbursement against an insurer or other responsible third parties, the taxpayer must demonstrate that there was no reasonable prospect of recovery on such claims in the year in which the loss was deducted in order to prove that a loss was in fact sustained during *99 such year. Hudock v. Commissioner,65 T.C. 351, 357 (1975); Gale v. Commissioner,supra at 276.
A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for reimbursement from third parties, and when there is a substantial possibility that such claim will be resolved in the taxpayer's favor. Ramsay Scarlett & Co. v. Commissioner,supra at 811. The issue is one of fact, to be decided on the basis of all of the facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs.When the claim for reimbursement has been litigated, losses have generally been held to have been sustained in the year in which the litigation ultimately was resolved, and not in the year in which the casualty or other event occurred. E.g., Hudock v. Commissioner,supra at 357; AlliedFurriers Corp. v. Commissioner,supra at 460; see sec. 1.165-1(d)(2)(i), Income Tax Regs.
In the case before us, the petitioner relies upon the fact that both Affiliated and the contractors denied liability for the loss to support its assertion that the prospects for recovery were dim. The fact that the petitioner's insurer and other potentially responsible parties denied liability is certainly a factor *100 to be considered, but it is not decisive. Gale v. Commissioner,41 T.C. at 276. The petitioner had procured the services of apparently independent and competent consultants to investigate the cause of the collapse, and those consultants had found that such collapse was attributable to the negligence of the contractors. Based upon such report, the petitioner instituted suit against the contractors. Scafield's Estate v. Commissioner,266 F. 2d 154, 159 (6th Cir. 1959), affg. on this issue 25 T.C. 774 (1956); Gale v. Commissioner,41 T.C. at 276. Moreover, an investigation conducted for Affiliated by an independent attorney specializing in such matters also found that the collapse was caused by defective materials and workmanship, and in the opinion of such attorney, the prospects for recovery from the contractors were excellent. Such evaluation subsequently was proved to be correct--a fact to be considered in evaluating the prospects for recovery which existed at the close of 1972. Gale v. Commissioner,41 T.C. at 276; but see Scofield's Estate v. Commissioner,266 F. 2d at 163; Ramsay Scarlett & Co. v. Commissioner,61 T.C. at 811. In view of these objective and persuasive indications *101 that the prospects were favorable, the petitioner has failed to convince us that there was no reasonable prospect of recovery at the end of 1972, and accordingly, we hold that no loss was sustained during such year. Having found there existed a reasonable prospect of recovery which bars a deduction for 1972, we do not reach the Commissioner's alternative argument. To reflect our conclusions and the concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue, unless otherwise indicated.↩
2. Such finding is based upon the stipulation of the parties.↩
3. The percentage of virgin pulp used varied according to the grade of paper to be produced.↩
4. Although Fort Howard calculated depreciation separately for each of its buildings, both parties treated its buildings as a single entity for purposes of determining the useful lives of its building component accounts.↩
5. At the trial, the Commissioner sought to introduce, via the testimony of the IRS engineer and another witness, evidence as to the useful lives used by other paper companies. The petitioner objected to and moved to strike such evidence. After due consideration, we have decided to grant such motion, because of the method used by the IRS engineer for selecting and collecting the information and because of the lack of relevance of the testimony of the other witness. Accordingly, we have not included such evidence in our findings of fact and have not relied upon it in reaching our decision. 6. See also Good Chevrolet v. Commissioner,T.C. Memo. 1977-291↩.
7. The Commissioner conceded that the boiler room portion of the power plant addition was sec. 38 property, as defined in sec. 48(a)(1)(B)(i)↩, and that construction of the power plant addition was commenced in time for it to qualify for the investment credit. See sec. 49(a)(1).
8. A centri screen is a device providing for the last screening of stock before the stock gets to the paper machine.
9. Sec. 50(a)(1) provides that the investment credit is applicable to qualifying property the construction of which is begun by the taxpayer after March 31, 1971, or the construction of which is completed after Aug. 15, 1971. However, the petitioner has made no effort to qualify under such provision, and we express no comments concerning its applicability. Furthermore, if sec. 50(a)(1) were applicable, sec. 50(b)↩ might be applicable so as the deny a credit for the costs incurred before Aug. 15, 1971.
10. Rev. Proc. 72-10 was superseded by Rev. Proc. 77-10, 1977-12 I.R.B. 4, 10, in which the description of assets used in the manufacture of paper and related products is as follows: 26.1 Manufacture of Pulp and Paper: Includes assets for pulp materials handling and storage, pulp mill processing, bleach processing, paper and paperboard manufacturing, and on-line finishing. Includes pollution control assets and all land improvements associated with the factory site or production process such as effluent ponds and canals, provided such improvements are depreciable but does not include buildings and structural components as defined in section 1.48-1(e)(1) of the regulations. * * * 26.2 Manufacture of Converted Paper, Paperboard, and Pulp Products: Includes assets used for modification, or remanufacture of paper and pulp into converted products, such as paper coated off the paper machine, paper bags, paper boxes, cartons and envelopes. * * * [Emphasis supplied.] Generally, Rev. Proc. 77-10 is only applicable to assets placed in service after its issuance, but it declares that any changes in the descriptions of asset guideline classes are not intended to alter the composition of such classes (Rev. Proc. 77-10↩ sec. 1.04).
11. The net amount of debts for each year was computed by subtracting from the total amount of debts that became worthless during the year the amount of recoveries during the year of any amounts previously written off.
a. The amount of debts determined to be worthless for 1971 includes $76,975 with respect to a single debtor. ↩
12. At the trial, one of the petitioner's witnesses testified that "for tax purposes" its bad debt reserve as of Dec. 31, 1969, was $88,000. However, on its Federal income tax return for 1970, the petitioner reported a balance in its bad debt reserve as of Dec. 31, 1969, of $120,000. Additionally, the schedule M-1, Reconciliation of Income per Books with Income per Return, attached to the petitioner's 1970 return, did not reveal any differences between the amount of the reserve for bad debts for tax purposes and the amount of such reserve for book purposes. There is no documentation to support the petitioner's assertion that for tax purposes, the balance in its bad debt reserve as of Dec. 31, 1969, was $88,000, and we have based our findings of fact upon information contained in the Federal income tax returns which were filed by the petitioner for the years at issue.